**UNITED STATES of America *ex rel.,*
Paul E. ATKINSON, Plaintiff,**

v.

**PENNSYLVANIA SHIPBUILDING
CO. and First Fidelity Bank,
N.A., Defendants.**

No. CIV.A.94–7316.

United States District Court,
E.D. Pennsylvania.

Aug. 30, 2002.

354

United States of America, ex rel., Paul E. Atkinson, Philadelphia, PA, Pro se.

Bijan Amini, Storch, George W. Croner, Janis Ettinger, Norman Trabulus, Steven G. Storch, Amini & Munves, PC, New York City, for Plaintiff.

David W. Engstrom, Harkins Cunninham Philadelphia, PA, John T. Boese, Fried Frank Harris, et al., Joseph O. Click, Dyer, Margaret A. Dillenburg, Ellis & Joseph, Washington, DC, Matthew Miner, Dechert Price & Rhoads, Philadelphia, PA, Melissa E. Lamb, Fried Frank Harris, et al., Michael Joseph, Patrick O. Cavanaugh, Richard A. Kirby, Dyer, Ellis & Joseph, Washington, DC, Thomas H. Lee, Dechert Price Rhoads, Gregory H. Mathews, Joseph G. Derespino, Derespino & Dougher PC, Philadelphia, PA, for Defendants.

**Memorandum and Order**

YOHN, District Judge.

## I. Factual Background and Procedural History

This is a *qui tam* action brought by Paul E. Atkinson ("Atkinson," "plaintiff" or "relator") pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729. The case, originally filed on December 5, 1994,[1] requires the court to engage in a lengthy, complicated legal analysis of various issues related to the interpretation of the FCA, federal pleading and jurisdictional standards, and the occasionally uneasy interaction among them. Moreover, it features an extensive factual background and procedural history, both of which are delineated at length in the court's Aug. 24, 2000 memorandum in this matter. *See Atkinson v. Pennsylvania Shipbuilding Co.*, 2000 WL 1207162, at *1–6 (E.D.Pa. Aug.24, 2000). Accordingly, I will not reiterate that discussion here. Before addressing the motions presently at bar, however, I will briefly summarize the basis for the present dispute, the import of the August, 2000 *Atkinson* holding, and the developments in the case since the issuance of that opinion.

### A. *Factual Background*

This lawsuit stems from a pattern of fraud allegedly perpetrated by defendants Pennsylvania Shipbuilding Co. ("Penn Ship") and First Fidelity Bank, N.A. ("Fidelity") on the United States Navy ("Navy") in connection with the construction of several Henry J. Kaiser class fleet Oiler ships ("Oilers"). Third Amended Complaint ("Complaint") ¶ 13. As occurs in the context of most government contracts, bids were solicited by the Navy for the construction of the Oilers.[2] *Id.* ¶ 38. Although Penn Ship desired the Oiler contract, Atkinson asserts, it was financially weak, a condition that was exacerbated by the use of a significant portion of its assets to "prop up" Levingston Shipbuilding Company ("Levingston"), a company that, like Penn Ship, was under the control of Edward E. Paden.[3] *Id.* ¶ 39. This weak-

1. While a separate *qui tam* action based on the transactions and occurrences currently at issue was brought in 1992 by Atkinson and Eugene Schorsch, a co-relator, it was dismissed without prejudice on September 2, 1993.

2. Although the original bid solicitation specified that the contract would be for nine Oilers, the contract ultimately provided for the construction of two Oilers, and granted the Navy options for additional ships. *See* Complaint ¶¶ 57, 69.

3. In fact, Penn Ship and Levingston were among several companies under Paden's control. This is central to relator's allegations, as he asserts that assets were transferred and

ness, if revealed, would have prevented Penn Ship from obtaining the contract, as it bore directly on the ability of the Paden companies generally, and Penn Ship specifically, to perform the Oiler contract, and thus on the likelihood of a default. *Id.* ¶ 48. Accordingly, plaintiff continues, Penn Ship undertook a ten year, multifaceted pattern of fraudulent misrepresentations and asset transfers, the purpose of which was to "deceive[ ] the Navy into concluding that Penn Ship's financial condition was better than it in fact was, and, in particular, [to] conceal[ ] from the Navy the extent of Levingston's financial weakness and the consequences of that weakness to Penn Ship." *Id.* ¶ 39.

Atkinson avers that this pattern of deception commenced prior to Penn Ship's submission of its Oiler contract bid. *Id.* ¶ 42. Specifically, he contends that Penn Ship's financial statement for fiscal 1984, dated September 30, 1984, omitted the required loss contingency relating to the impairment of its Levingston receivable. *Id.* ¶¶ 43–44A. He asserts that Penn Ship's December 31, 1984 interim financial statement similarly lacked such a loss contingency, and that this statement also failed to disclose Penn Ship's guaranties of Levingston's worker's compensation insurance obligations. *Id.* ¶ 49.

After the close of the bidding period, it was revealed that Penn Ship had submitted the lowest bid, a result that Atkinson alleges was made possible by Penn Ship's knowing, fraudulent disregard of the cost of architectural drawings and the attendant delay that the creation of these schematics would impose before construction of the ships could begin. *Id.* ¶ 57. Before the Oiler contract was awarded to Penn Ship, however, the Navy requested that Penn Ship secure it against the reprocurement costs it would incur in the event of a Penn Ship default. *Id.* ¶ 61. Penn Ship provided the desired security interest to the Navy in the form of a Trust Indenture, with Fidelity serving as the trustee, and the trust res including security agreements and mortgages [4] on all but seven acres of the Chester ship yard ("Chester yard")-in which Penn Ship's ship building operations were centered-and in some of the equipment used by Penn Ship.[5] *Id.* ¶¶ 62–65. Atkinson avers that on March 15, 1985, as a means of inducing the Navy to accept the Trust Indenture-without which the Oiler contract would not have been awarded to Penn Ship–Thomas Weller, the chairman of Penn Ship, sent a letter ("the Weller letter") to Christopher Pigott, a financial analyst of Naval Sea Systems Command and a member of the team responsible for the financial analysis of Penn Ship's proposal. *Id.* ¶ 64. In this letter, plaintiff asserts, Weller intentionally made several false representations to the Navy regarding the degree of security afforded the Navy by the Trust Indenture.

debts assumed among these "Paden companies" as a means of deceiving the Navy.

As for Penn Ship's alleged financial support of Levingston, Atkinson avers specifically that Penn Ship guaranteed the payment of Levingston's workers' compensation insurance premiums and related expenses. The reason for this, he posits, was that if Levingston was left to default on these premiums, such "would have called into question the ability of the Paden companies, including Penn Ship, to maintain and pay for a work force...." Complaint ¶ 48.

4. These mortgages and financing statements are attached as exhibits to the Trust Indenture and incorporated therein.

5. For reasons that are delineated fully in the previous *Atkinson* opinion, two other Paden companies-Delaware Drydock & Ship Repair ("DDSR") and Maritime Offshore Equipment Leasing Company ("MOEL")-also were parties to the Trust Indenture, as they technically owned some of the assets in which the Navy was granted security interests under the Indenture. Complaint ¶ 66.

*Id.* ¶¶ 67–69. On March 26, 1985, the Navy assented to the terms of the Trust Indenture, and on May 6, 1985, it awarded the Oiler contract to Penn Ship, thereby rendering the Indenture immediately effective.

Relator contends, however, that Fidelity and Penn Ship conspired to defeat the Trust Indenture. This allegedly transpired, in Penn Ship's case, by intentionally failing to record-and thus perfect-the security instruments specified in the Indenture. Fidelity's asserted role in the conspiracy consisted of 1) convincing the Navy not to mandate the inclusion of a provision within the Indenture that would have required the delivery by Fidelity of "copies of all recording documents to the Navy" [6]; 2) failing to insist that the security interests be perfected; 3) not perfecting those interests itself; and 4) failing to inform the Navy that they had not been perfected. *Id.* ¶¶ 70–70K. As a result of these fraudulent actions, Atkinson alleges, the Navy was unaware that it was not secured against potential reprocurement costs.[7] Plaintiff contends that based on this misunderstanding and its false impression of Penn Ship's financial well being, both of which were fraudulently induced, the Navy exercised during February, 1986 its option to order a third, and then, during February, 1987, a fourth Oiler from Penn Ship. *Id.* ¶¶ 76–77.

During late 1987, with the first Oiler being due for delivery in March, 1989, Penn Ship informed the United States that it was experiencing financial difficulty, a direct consequence, relator asserts, of the matters misrepresented by Penn Ship to the Navy prior to the award of the Oiler contract. *Id.* ¶ 78. It consequently requested permission to transfer the two option Oilers to another ship builder. *Id.* ¶ 79. On June 5, 1988, the Navy agreed, and signed Modification 5 ("Mod.5") to the contract. *Id.* ¶ 80. Besides eliminating the two option Oilers from the contract, Mod. 5 restructured Penn Ship's compensation arrangement, changing it from a cost reimbursement incentive price contract for $222,476,849 for the original two Oilers to a fixed price contract for $331,400,000 for the same two ships. *Id.* ¶ 81. Atkinson asserts that Mod. 5, and the resultant increase in the Navy's overall costs, were a direct consequence of Penn Ship's misrepresentations regarding its financial condition and the degree of security provided by the Trust Indenture. *Id.* ¶ 82.

Also allegedly caused by these false representations was Modification 11 ("Mod.11") to the Oiler contract, which was executed on January 26, 1989, and which similarly was asserted by Penn Ship to have been necessitated by its worsening financial status. *Id.* ¶ 83. Pursuant to the terms of Mod. 11, a $10 million payment was advanced by the Navy to Penn Ship. As a means of securing this advance payment, Penn Ship granted the Navy a $17 million secured interest in a large floating drydock located at the Chester yard. *Id.* ¶¶ 83, 86.

6. Specifically, relator asserts that the Navy rejected an initial version of the Trust Indenture, dated March 15, 1985, and indicated its desired changes in handwritten notations on that version of the agreement. While some of the Navy's proposed changes were incorporated in the final version of the Trust Indenture, this "delivery" provision was not, and based on this fact-and the idea that it would have aroused Navy suspicion if the request to omit this provision had come from Penn Ship, on which the provision placed literally no burden-Atkinson concludes that Fidelity convinced the Navy not to insist on its inclusion.

7. Additionally, relator asserts, because the Chester yard was not encumbered under the Trust Indenture, it was "more available [to Penn Ship] as collateral for further borrowings." Complaint ¶ 71.

On August 24, 1989, the United States and Penn Ship agreed to again modify the Oiler contract, and they signed Modification 17 ("Mod. 17" or the "default Mod."). *Id.* ¶ 85. The default Mod. terminated the Trust Indenture and transferred the two original Oilers to another shipyard. *Id.* Although Atkinson avers that the default Mod. "substantially released Penn Ship from liability under the contract," Penn Ship remained obligated to compensate the Navy for the reprocurement costs and other expenses occasioned by its default. *Id.* ¶ 86. As a means of securing this remaining obligation, Penn Ship agreed to an increase of $2 million in the Navy's security interest in the floating drydock. *Id.* It also agreed to exert a good faith effort to sell within the ensuing thirteen months some of the land and buildings that comprised the Chester yard and the Sun 800, a massive floating derrick owned by Penn Ship, and to apply a portion of the proceeds of such a sale toward the Navy's reprocurement costs. *Id.* ¶ 88. To secure its new obligation to attempt to liquidate these assets, Penn Ship conveyed to the Navy a subordinated mortgage on the land and buildings and a preferred ship mortgage on the Sun 800. *Id.*

Plaintiff contends that these "security interests were fraudulent because Penn Ship never intended to and never tried to use its best efforts to sell [these assets] during the thirteen-month period." *Id.* ¶ 89. Although Penn Ship allegedly did not attempt to sell these assets during those thirteen months, Atkinson asserts, it did cause the formation of Marine Capital Corporation ("MCC") during this period, which purchased the Sun 800 following the expiration of the thirteen months. *Id.* On July 25, 1991, less than three weeks after MCC bought the derrick from Penn Ship, it sold the apparatus to Donjon Marine Co, Inc. ("Donjon"), a good faith purchaser for value. *Id.* ¶ 94. This sale allegedly foreclosed the Navy from proceeding "against the derrick as collateral for Penn Ship's breached obligation to sell the land, buildings and derrick within thirteen months. . . ." *Id.* Relator further posits that MCC fraudulently certified that the apparatus was free and clear of all liens and encumbrances when it sold the Sun 800 to Donjon, just as Penn Ship allegedly had done in connection with its sale of the derrick to MCC. *Id.* ¶ 95. On January 12, 1992, Penn Ship and the Navy entered into Modification 20 ("Mod.20") to the Oiler contract, pursuant to which the Navy fully released Penn Ship from all responsibility and liability under the contract.

*B. Recent Procedural History*

As indicated, *supra*, Atkinson has brought two separate *qui tam* actions based on the foregoing factual allegations-this being the second-and has on three separate occasions amended his complaint in the present case. Like the factual basis for this suit, this extensive procedural history was explicated in detail in the court's previous *Atkinson* memorandum. Accordingly, I will focus in this section on the procedural developments in this case since the filing of that opinion.

In his second amended complaint, which was subject of the court's prior *Atkinson* decision, relator advanced fourteen claims against Penn Ship, some of which also were brought against Fidelity and Sun Ship, Inc. ("Sun Ship"), a party whose absence from the third amended complaint explains the lack of reference to it in the above factual synopsis. These claims were based on numerous aspects of the pattern of dealing outlined above, and were advanced pursuant to various subsections of 31 U.S.C. § 3729. Each defendant moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss every count of the second amended complaint in which it was named as a defendant, asserting that the allegations of

fraud contained therein were pled with insufficient particularity to satisfy Fed. R.Civ.P. 9(b). Ultimately, all of plaintiff's claims against Fidelity and Sun Ship, as well as some of his claims against Penn Ship, were dismissed on this basis. These dismissals, however, were entered without prejudice to Atkinson's right to amend his complaint "within the confines of Rule 11." *Atkinson,* 2000 WL 1207162, at *1.

On October 16, 2000, Atkinson filed his third amended complaint, which features twelve distinct claims. The factual allegations made within this pleading are substantially the same as those contained in its antecedent, although the account currently presented by relator is in places more robust, presumably in an effort to cure the deficiencies that led to the dismissal of significant portions of his second amended complaint. While Penn Ship and Fidelity remain as parties to the action, Sun Ship has been dropped as a defendant. As for plaintiff's specific claims, these also largely mirror those advanced in the second amended complaint. For example, claim 1, like its earlier counterpart, alleges a conspiracy to defraud the government, claim 2 similarly concerns Penn Ship's September 30, 1984 financial statement, and so on. Indeed, in general terms, there are only three differences between the claims contained in relator's second and third amended complaints. First, just as the body of the third amended complaint features more detailed factual allegations, the assertions comprising many of the claims themselves are similarly more extensive. Second, claims 7, 13 and 14 from the second amended complaint have been abandoned in Atkinson's most recent pleading. Third, the third amended complaint contains one completely novel claim relating to the cost reimbursement invoices submitted by Penn Ship to the Navy in connection with the Oiler contract prior to its conversion into a fixed price arrangement, and the payments it received in return.[8]

As stated above, the court's previous *Atkinson* holding addressed only the defendants' motions to dismiss the second amended complaint pursuant to Fed. R.Civ.P. 12(b)(6). While I noted that the defendants also had indicated their intention to move for dismissal on the ground that the court lacks subject matter jurisdiction over Atkinson's claims, that issue had not been fully briefed at the time of the opinion's issuance, and accordingly was not addressed therein. *See* 2000 WL 1207162, at *6 n. 11. Since the filing of relator's third amended complaint, however, defendants have moved pursuant to Fed.R.Civ.P. 12(b)(1) to dismiss this pleading, the parties have conducted extensive discovery on the 12(b)(1) issue, and plaintiff, Penn Ship and Fidelity each have briefed extensively the question of whether the court has jurisdiction over the subject matter of this dispute. Consequently, this issue is ripe for disposition. Also before the court are Fidelity's motion to dismiss Atkinson's claims against it pursuant to Fed.R.Civ.P. 12(b)(6), Penn Ship's motion for partial dismissal based on the statute of limitations, and Penn Ship's motion to dismiss relator's first, second, sixth, tenth, eleventh and "additional" claims against it pursuant to Fed.R.Civ.P. 12(b)(6).

After considering each of the parties' submissions and the arguments raised therein, I conclude that the court lacks

8. Atkinson asserts that the bi-weekly reimbursement vouchers and/or invoices submitted by Penn Ship to the Navy under the pre-modification contract were, apart from any fraud in the procurement of the Oiler contract, themselves false or fraudulent in that they overstated Penn Ship's costs to date, and thus requested compensation exceeding the amount to which it was contractually entitled. Complaint ¶ 99.

subject matter jurisdiction over each count of relator's complaint with the exception of his first, which sounds in an alleged conspiracy under 31 U.S.C. § 3729(a)(3). Although defendants raise numerous arguments in favor of dismissing this remaining count pursuant to Fed.R.Civ.P. 12(b)(6), only two of these contentions are availing, and both of them compel only the partial dismissal of plaintiff's first count. Specifically, I conclude that defendants are correct in asserting that Atkinson's conspiracy allegation is non-justiciable insofar as it is based on reverse false claims that allegedly were made by Penn Ship, and that relator is barred by the FCA's six year statute of limitations from basing his first count on false claims submitted by Penn Ship prior to December 4, 1988.

Accordingly, defendants' motion for dismissal pursuant to Rule 12(b)(1) will be granted except with respect to Atkinson's first count insofar as it sounds in Penn Ship's non-recording of the Navy's security instruments and Fidelity's failure to ensure such recordation. I also will grant defendants' motion to dismiss relator's first count pursuant to Rule 12(b)(6) to the extent that it is based on the making by Penn Ship of reverse false claims. Similarly, Penn Ship's motion for the partial dismissal of this count on statute of limitations grounds will be granted to the extent that it is based on claims submitted prior to December 4, 1988. The balance of defendants' motions will be denied.

## II. Analysis

### A. *Defendants' Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1)*

#### 1. Legal Standard

In evaluating a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), the court must first determine whether it is confronted with a facial or factual challenge to its jurisdiction.[9] *Gould Elecs., Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000). In this case, the jurisdictional challenge raised by Penn Ship and Fidelity unquestionably is factual in nature, as it concerns not an alleged pleading deficiency, but rather the actual failure of relator's claims to comport with the jurisdictional prerequisites contained in 31 U.S.C. § 3730(e)(4). Accordingly, the court's evaluation is not confined to the four corners of the complaint, viewed in the light most favorable to the plaintiff, and any reasonable inferences that could be drawn therefrom, as it would be in the case of a facial challenge. *See id.* (citing *PBGC v. White,* 998 F.2d 1192, 1196 (3d Cir.1993)). Instead, "the court may consider and weigh evidence outside the pleadings to determine if it has jurisdiction." *Id.* at

9. The distinction between these jurisdictional arguments was discussed by our Court of Appeals in *Mortensen v. First Fed. Sav. & Loan Ass'n,* in which the court stated:

> [W]e must emphasize a crucial distinction, often overlooked, between 12(b)(1) motions that attack the complaint on its face and 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings. The facial attack does offer similar safeguards to the plaintiff [as does the standard by which 12(b)(6) motions are evaluated]: the court must consider the allegations of the complaint as true. The factual attack, however, differs greatly for here the trial court may proceed as it never could under 12(b)(6) or Fed. R.Civ.P. 56(b). Because at issue in a factual 12(b)(1) motion is the trial court's ... very power to hear the case[,] there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of [this] power.... In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

549 F.2d 884, 891 (3d Cir.1977).

178. Ultimately, the burden lies with Atkinson, as plaintiff, to demonstrate the existence of federal subject matter jurisdiction over his claims. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir.1991).

2. Discussion

Defendants raise two primary arguments against the court's exercise of subject matter jurisdiction over relator's claims, and in order to fully understand each, it is necessary to explore briefly the historical development of the False Claims Act. As more fully delineated by the Third Circuit in *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, the FCA dates back to 1863, when it was adopted "in response to rampant fraud by Civil War defense contractors." 944 F.2d 1149, 1153 (3d Cir. 1991). The Act embodied an expansive remedial scheme, "allowing any person to prosecute a claim on behalf of the United States against any person who knowingly submitted a false claim to the Government." *Id.* In the 1940s, however, abuse of the *qui tam* form of action became prevalent, as individuals without any independent knowledge of false claims were nonetheless bringing FCA suits, often after learning of the fraud in question by inspecting criminal indictments. *See id.* In 1943, the Supreme Court upheld the legality of this practice, *see United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), and Congress responded that same year by amending the FCA to "bar[ ] jurisdiction where a *qui tam* suit was based on information in the possession of the government unless the information on which the suit was based was 'original with such person.' " *Id.* (quoting 89 Cong. Rec. 510, 744 (daily ed. Dec. 16, 1943)). As indicated by the *Stinson*court, the post–1943 language "was broadly construed by courts to bar jurisdiction whenever the Government possessed the information on which the claim was brought, even when the information had been provided to the Government by the *qui tam* plaintiff before the filing of the claim." *Id.* at 1153–54.

This strict interpretation ultimately proved to be overly rigid, and the FCA was again amended on October 27, 1986, at which time the Act assumed its current, less constrictive form. Indeed, in enacting the 1986 amendment to the False Claims Act, Congress sought to "encourage persons with first-hand knowledge of fraudulent misconduct to report fraud." *Stinson,* 944 F.2d at 1154. Consistent with this purpose, the FCA's previous focus on whether the government possessed the information in question at the time of the action's inception was replaced with a concern with whether the relator learned of the alleged fraud through certain specified public disclosures.[10] *See generally id.* at 1152. This principle is codified at 31 U.S.C. § 3730(e)(4), which provides that:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the

10. While there are other jurisdictional bars contained in 31 U.S.C. § 3730(e), this is the provision that is relevant to defendants' motion.

allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

Defendants' first argument regarding the court's subject matter jurisdiction is a broad contention, and it revolves around the non-retroactivity of the FCA's 1986 amendment. *See generally Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939, 945–52, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (holding that the 1986 amendment does not apply retroactively to conduct occurring prior to its effective date). It posits, in general terms, that those of plaintiff's allegations that focus on events occurring prior to October 27, 1986 are governed by the highly restrictive, pre-amendment version of the FCA's jurisdictional bar. Under this earlier, tougher standard, defendants assert, relator's claims are non-jurisdictional, as the government possessed at the time of this action's inception the information on which these allegations are based.

Distilled to its essence, defendants' second argument, while factually intricate, stems from a fairly straightforward legal proposition. It assumes that relator's claims are governed by the post–1986 incarnation of the FCA, and it posits that at the time that this action was filed, the allegations or transactions underlying each of relator's claims had been publicly disclosed through one of the means enumerated in § 3730(e)(4)(A). Defendants further assert that Atkinson is not an "original source" of this information within the meaning of § 3730(e)(4)(B). Accordingly, Penn Ship and Fidelity aver, the court has been statutorily denied original jurisdiction over Atkinson's claims.

a. Defendants' First Jurisdictional Argument

As mentioned above, prior to being amended in 1986, the FCA's jurisdictional bar based on public disclosure was draconian as compared with its modern incarnation. Indeed, the Act not only eliminated federal jurisdiction over *qui tam* suits in which the relator's allegations of fraud were based on allegations or transactions that had been publicly disclosed, but it also excluded from the purview of the federal courts any FCA action based on evidence possessed by the government when the action was brought. Taken literally, as routinely occurred prior to 1986, this statutory framework "bar[red] jurisdiction ... even when the information had been provided to the Government by the *qui tam* plaintiff before the filing of the claim." *Stinson,* 944 F.2d at 1153–54 (citing *United States ex rel. Wisconsin v. Dean,* 729 F.2d 1100, 1106 (7th Cir.1984) and *United States v. Aster,* 275 F.2d 281 (3d Cir. 1960)).

Although the 1986 amendment lessened the jurisdictional constriction occasioned by the pre–1986 version of the FCA, defendants contend that this amendment is not retroactively applicable to false claims submitted before the date of the amendment's enactment. *See* Memorandum in Support of Motion of Defendant Pennsylvania Shipbuilding Company to Dismiss the Third Amended Complaint for Lack of Subject Matter Jurisdiction ("Def.'s Memo.") at 52 (citing *Hughes Aircraft Co.,* 520 U.S. at 946, 117 S.Ct. 1871).[11] More-

11. While this motion initially was filed by Penn Ship, Fidelity subsequently joined in Penn Ship's legal arguments as to the court's lack of subject matter jurisdiction. *See* Defendant First Fidelity Bank, N.A.'s Joinder in Penn Ship's Reply Memorandum of Law in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction. Accordingly, throughout this memorandum I will refer to the jurisdictional arguments advanced by Penn Ship as being raised by both defendants in this suit.

over, they assert, "the Third Circuit has held that this [pre-amendment] provision ... bars *qui tam* claims based on false claims submitted before October 27, 1986 if the government had evidence or information upon which the *qui tam* [suit is] based when the action was brought, even if it obtained the information after [October 27, 1986]." *Id.* (citing *United States ex rel. Cantekin v. University of Pittsburgh,* 192 F.3d 402, 409 (3d Cir.1999)). Defendants posit that, when applied to this case, these principles mandate the dismissal of the first through tenth counts of Atkinson's complaint, as the alleged conspiracy and false statements on which these counts are based occurred prior to the amendment of the FCA on October 27, 1986, and the government had evidence of the same on December 5, 1994, the date on which the instant action was filed. Def.'s Motion at 52–53.

Relator contests this assertion. He contends that while defendants are correct in that the pre–1986 version of the FCA's jurisdictional bar applies to false claims submitted before October 27, 1986, most of the claims at issue in this suit were submitted after that date. *See* Plaintiff–Relator's Memorandum of Law in Opposition to Defendants' Motions to Dismiss ("Relator's Memo.") at 49. Specifically, he avers that while the award of the Oiler contract and the fraudulent assertions that induced the Navy's assent thereto predated the amendment, the actual submission and payment of most of Penn Ship's fraudulent claims occurred after the amendment's effective date. *See id.*

Upon reviewing the parties' contentions as to this issue, I conclude that Atkinson's is more compelling. Preliminarily, as plaintiff concedes, defendants' assertion regarding the non-retroactivity of the 1986 amendment is well-founded. *See Cantekin,* 192 F.3d at 409 ("[T]he pre–1986 law [applies] to all [claims] submitted prior to the October 27, 1986 effective date."); Relator's Memo. at 49. As such, to evaluate defendants' first jurisdictional argument, it is necessary to determine which, if any, of the alleged false claims submitted by Penn Ship antedated the 1986 amendment. The obvious way to begin this analysis is by clarifying the meaning of the word "claim" as it is used in the FCA. It is unnecessary to embark on a wide-ranging definitional search, however, as that term is explicitly defined by the False Claims Act. The statute states:

> For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c); *see also Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 183–84 (3d Cir.2001).

Notably, this definition encompasses only requests or demands for money or property; pursuant to the principle of *expressio unius est exclusio alterius,* excluded from this definition are mere false statements or representations which ultimately lead to a request or demand for money or property. As stated by the Fourth Circuit:

> In order for a false statement to be actionable under the False Claims Act it must constitute a "false or fraudulent claim." "[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" Therefore, a central question in False Claims Act cases is whether the defendant ever presented a "false or fraudu-

lent claim" to the government. Interpreting the last word of the phrase is fairly easy. The False Claims Act states that a claim "includes any request or demand ... for money or property" where the government provides any portion of the money or property requested. In other words, the False Claims Act at least requires the presence of a claim-a call upon the government fisc-for liability to attach.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir.1999) (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir.1995)).

In this case, relator alleges (and defendants do not dispute) that the only requests or demands for payment made by Penn Ship prior to October 27, 1986 were roughly the first half of the biweekly reimbursement invoices that it submitted to the Navy from the inception of the Oiler contract on May 6, 1985 until the contract's conversion into a fixed price agreement on June 16, 1988.[12] *See generally* Complaint ¶ 98. None of Penn Ship's other requests or demands for payment were made prior to the FCA's 1986 amendment.

When relator's complaint is examined closely, it becomes apparent that only the "additional" count[13] advanced by Atkinson is based directly-and it only in part-on these pre-October 27, 1986 claims. None of plaintiff's other counts that concern actions allegedly taken by Penn Ship prior to the FCA amendment's effective date[14] sound in the submission of false or fraudulent claims per se. Rather, they concern the making of false representations that induced the Navy's acquiescence to the Oiler contract, pursuant to which Penn Ship allegedly submitted false claims to the Navy both before and after October 27, 1986. Because many of the demands for payment that these representations allegedly rendered fraudulent were made after the amendment's effective date, the counts of relator's complaint that are based on these representations are not subject to the pre-amendment jurisdictional bar.

■ Accordingly, the pre-1986 version of the FCA's jurisdictional provision applies only to Atkinson's "additional" count-that is, the claim focusing on Penn Ship's submission to the Navy of the biweekly

12. These claims, Atkinson avers, were fraudulent because the Oiler contract pursuant to which they were made was procured by fraud, and also because the invoices themselves overstated Penn Ship's costs to date. Complaint ¶¶ 99–100.

13. The term "count" is employed here so as to distinguish the asserted bases for relief in relator's complaint (his "counts") from the fraudulent "claims" that allegedly were submitted to the Navy by Penn Ship. Elsewhere in this memorandum, I refer to relator's assertions as his "claims."

14. These are claims 1–6 and 8, which concern specifically 1) an alleged conspiracy between Penn Ship, Fidelity and others to defraud the United States government by not recording the security interests provided for by the Trust Indenture (or, in Fidelity's case, not signing the financing statements or ensuring that Penn Ship recorded those security instruments), and thereby facilitating the making of subsequent false claims and reverse false claims; 2) Penn Ship's September 30, 1984 financial statement; 3) Penn Ship's December 31, 1984 financial statement; 4) Penn Ship's alleged failure to account for the cost of architectural drawings and the attendant delays in its best and final proposal; 5) the Weller letter; 6) the misuse by Penn Ship and Fidelity of the Trust Indenture; and 8) the inducement of the Navy's exercise of its option to commission the third Oiler.

Although defendants argue that each of Atkinson's first ten counts is subject to dismissal under the pre–1986 version of the public disclosure bar, *see* Def.'s Memo. at 52, the incidents addressed in counts nine and ten transpired in February, 1987 and June, 1988, respectively, and thus could not possibly be encompassed within the scope of the pre-amendment provision.

invoices or vouchers-and only to the extent that this count concerns submissions made prior to October 27, 1986. Insofar as that count focuses on those claims, then, the court is without subject matter jurisdiction if the facts on which relator's allegations are based were known to the government at the time at which this action was filed, i.e., on December 5, 1994. While, as explained, I am free to look beyond the four corners of relator's complaint to resolve the question of what the government knew when, I find such to be unnecessary in the present context. This is so because, by his own admission, Atkinson "reported what he learned to various government agencies as he learned it, in the hope that the wrongs would be investigated, stopped and remedied." Complaint ¶ 14. Whether or not he learned of (and thus reported) Penn Ship's pre-1986 fraudulent claims at the times of their submission, by logical necessity he knew of them some time before the instant complaint was drafted, and thus, by virtue of plaintiff's own account, the court must conclude that, at the time of this suit's inception, the government had within its possession information regarding these fraudulent pre-amendment claims on the part of Penn Ship. This appears to be precisely the sort of case described by the Third Circuit in *Stinson,* that is, one in which federal jurisdiction is barred despite the fact that "the information [was] provided to the Government by the *qui tam* plaintiff before the filing of the claim." 944 F.2d at 1154. Accordingly, to the extent that it concerns claims submitted by Penn Ship prior to October 27, 1986, plaintiff's additional count will be dismissed for lack of subject matter jurisdiction.

b. Defendants' Second Jurisdictional Argument

■ Defendants next argue that the factual basis for each count of Atkinson's complaint was publicly disclosed through one of the means enumerated in 31 U.S.C. § 3730(e)(4)(A) prior to appearing in the complaint,[15] and that plaintiff is not an

15. In evaluating this contention, the court must be concerned with whether the public disclosure of a given allegation predated the appearance of that allegation in Atkinson's complaint, *not* with whether the public disclosure antedated the inception of this action. Although some of the counts presently advanced by plaintiff were first raised in the original 1994 complaint, others first appeared in one of his amended complaints. This creates the possibility that an allegation could have been publicly disclosed after the inception of this suit, but prior to relator's assertion of a count based on that allegation. Under these circumstances, the court will lack subject matter jurisdiction over that count unless relator is an "original source" of the information underlying it within the meaning of § 3730(e)(4)(B).

Unlike the FCA's "original source" provision, which requires an original source to disclose to the government the information on which the allegations of fraud are based "*before filing an action* under [the FCA]," § 3730(e)(4)(B), § 3730(e)(4)(A) renders nonjurisdictional any *qui tam* claim that is *based on* a statutorily-delineated public disclosure. Thus, under *United States ex rel. Mistick PBT v. Hous. Auth.*, 186 F.3d 376, 388 (3d Cir. 1999), so long as a public disclosure within the meaning of § 3730(e)(4)(A) occurs, and a substantially similar claim subsequently is advanced, that claim will be non-jurisdictional under the terms of § 3730(e)(4)(A) unless the relator is an original source under § 3730(e)(4)(B). *See infra.* This is so regardless of whether such a "substantially similar" claim is advanced at the time of the *qui tam* action's filing or instead is raised via an amendment to the initial complaint. To conclude otherwise would be to ignore the purpose of the public disclosure bar, namely to "encourage persons with first-hand knowledge of fraudulent misconduct to report fraud." *Stinson,* 944 F.2d at 1154.

Moreover, were the public disclosure provision effective only where the subject disclosure transpired prior to the inception of the FCA action, that jurisdictional limitation would be readily circumvented. For example, pursuant to *Mistick,* 186 F.3d at 383, information revealed in response to a FOIA

"original source" of this information as per § 3730(e)(4)(B). The Third Circuit has made it clear that in a FCA case featuring a § 3730(e)(4) challenge to multiple claims, it is necessary to evaluate the relator's claims individually to resolve the question of subject matter jurisdiction. *United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 102 (3d Cir.2000) ("[I]n applying section (e)(4), it seems clear that each claim in a multi-claim complaint must be treated as if it stood alone.").

█ Thus, the court must undertake a bipartite inquiry in the context of each of plaintiff's claims. First, I must determine whether the allegation or transaction on which the claim is based was publicly disclosed through one of the means delineated in § 3730(e)(4)(A) prior to appearing in Atkinson's complaint. *See United States ex rel. Dunleavy v. County of Delaware,* 123 F.3d 734, 740 (3d Cir.1997). In making this determination, the court must be mindful of the Third Circuit's holding that "the FCA's reference to 'allegations or transactions' is in the disjunctive, so that disclosures which reveal either the allegations of fraud or the elements of the underlying fraudulent transaction are sufficient to invoke the jurisdictional bar." *Id.* (citations omitted). Notably, after articulating this general proposition, the *Dunleavy* court adopted the D.C. Circuit's formulaic expression of this interpretation of the "public disclosure" provision. *See id.* at 741 (citing *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 654 (D.C.Cir.1994)). In *Springfield Terminal,* the D.C. Circuit recognized that if an allegation of fraud is represented by the symbol Z, the fraudulent transaction consists of two elements: a misrepresented state of facts (X), and a true state of facts (Y). *See* 14 F.3d at 655. Translated into a variable equation, this formula appears as follows: $Z = X + Y$. *See id.; Dunleavy,* 123 F.3d at 741 ("[T]he inference of fraud requires recognition of but two elements: 'A misrepresented state of facts and a true state of facts.' ... Injected into the above formula the variables take on the following labels: 'X (misrepresented state of facts) + Y (true state of facts) = Z (fraud).'" (quoting *Springfield Terminal,* 14 F.3d at 655 and *United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 687 (D.C.Cir.(1997)). Thus, if I am to conclude that a fraudulent allegation or transaction has been publicly disclosed within the meaning of 31 U.S.C. § 3730(e)(4)(A), either Z or both X and Y must have been revealed to the general public through one of the means specified in that section.

█ Our Court of Appeals also has addressed the meaning of the phrase "based upon" as used in § 3730(e)(4)(A).[16] *See United States ex rel. Mistick PBT v. Hous. Auth.,* 186 F.3d 376, 385–88 (3d Cir.1999). In analyzing the meaning of

request constitutes a public disclosure within the meaning of 3730(e)(4)(A). Yet if the public disclosure bar applied only in cases in which the relevant information is disclosed prior to the action's inception, as opposed to the time at which a claim actually is advanced for the first time, a plaintiff could simply file a *qui tam* suit, then make a FOIA request, subsequently amend his complaint to add the information revealed as a basis for his claim(s), and proceed with his action. This too would run counter to the purpose of the public disclosure bar.

**16.** To reiterate, this section reads as follows:

> No court shall have jurisdiction over an action under this section *based upon* the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (emphasis added).

that language, the *Mistick* court first considered the Fourth Circuit's reading of the phrase, namely that " 'based upon' means actually derived from." *Id.* at 385 (citing *United States ex rel. Siller v. Becton Dickinson & Co.,* 21 F.3d 1339, 1348 (4th Cir. 1994)). However, the court ultimately rejected this interpretation as one that effectively would render the "original source" exception superfluous. *See id.* at 386–87. In the end, the court aligned itself with nearly every other court of appeals that had considered the issue, and held that " 'based upon' means 'supported by' or 'substantially similar to,' [17] so that the relator's independent knowledge of the information is irrelevant." *Id.* at 386 (citations omitted). Put differently, a claim brought by a particular relator will be said to be "based on" a public disclosure "if the disclosure sets out either the allegations advanced in the *qui tam* [claim] or all of the essential elements of the *qui tam* action's claim[ ]," [18] i.e., Z or X + Y. *Id.* at 388.

Second, if a given claim advanced by relator is based on an allegation or transaction that was publicly disclosed, I must decide whether Atkinson is an original source of that information. *See United States ex rel. Barth v. Ridgedale Elec., Inc.,* 44 F.3d 699, 703 (8th Cir.1995) ("A court reaches the original source question only if it finds the plaintiff's suit is based on information that has already been publicly disclosed."). Under § 3730(e)(4)(B), an "original source" is one with "direct and independent knowledge of the information on which the allegations are based" who "has voluntarily provided the information to the Government before filing an action under [the FCA]." *Id.* Direct knowledge is that which is possessed immediately, without any "intervening agency, instrumentality or influence." *Stinson,* 944 F.2d at 1160. As the *Stinson*court further noted, "a relator who would not have learned of the information absent public disclosure [does] not have 'independent' information within the statutory definition of 'original source.' " *Id.* Indeed, "[w]hile 'it is not necessary for a relator to have all the relevant information in order to qualify as independent,' " ... a relator cannot be said to [fall within the original source exception] if [he] has no direct knowledge of the allegedly fraudulent statements" on which his claim is based. *Mistick,* 186 F.3d at 389 (quoting *Stinson,* 944 F.2d at 1160).

In applying this analytical framework to relator's complaint, it will be necessary at the outset to specify with precision the essential elements of the particular allegation(s) or transaction(s) in question; without knowing exactly what occurrences are at issue, it would be impossible to determine whether those occurrences had been publicly disclosed. While this determination will be obvious in some cases, e.g., plaintiff's claims concerning specific financial statements, it will be less easily made in others, e.g., defining precisely the elements of the conspiracy alleged in Atkinson's first count. Once this process is complete, I may undertake the above-described "public disclosure" and, if necessary, "original source" analyses.

17. *Dunleavy,* in holding that all of the essential elements of the fraud alleged by a relator must be contained in the public disclosure for § 3730(e)(4)'s jurisdictional bar to apply, may be said to have spoken to the question of exactly how similar must the allegations or transactions publicly disclosed be.

18. While the language used by the *Mistick* court framed the "based upon" inquiry in terms of whether the "allegations advanced in the qui tam *action* "-as opposed to the allegation or transaction underlying a particular claim within an action-had been publicly disclosed, this broad, action-based analysis has been supplanted by *Merena* 's claim-based approach. *See* 205 F.3d at 102.

*Count One*

The first count of relator's complaint concerns an alleged conspiracy between Penn Ship and Fidelity to cause "false and fraudulent claims and reverse false claims [to be] allowed or paid in violation of 31 U.S.C. § 3729(a)(3)." Complaint ¶ 104. Drawing on the allegations made by Atkinson, defendants identify-and plaintiff explicitly confirms the existence of-four components of this conspiracy. *See* Def.'s Memo. at 24; Relator's Memo. at 44. First, they describe Penn Ship's alleged participation as consisting of its intentional failure to record the security instruments identified in the Trust Indenture. Def.'s Memo. at 24. Next, they characterize Fidelity's alleged role in the conspiracy as being comprised of three distinct actions or sets of actions:[19] 1) its efforts to convince the Navy to accept a version of the Trust Indenture that excluded a provision for the delivery by Fidelity of all recording documents to the Navy;[20] 2) its failure to exercise its right under the Trust Indenture to seek, at no cost to itself, the advice of counsel regarding the actions necessary or advisable to perfect the Navy's security interests as identified therein-put differently, Fidelity's failure to ensure that the security instruments were recorded; and 3) its failure to sign the UCC–1 financing statements as would have been necessary to perfect the Navy's security interests. *Id.* Defendants then proceed to delineate the way(s) in which each of these three allegations are based on public disclosures within the meaning of 31 U.S.C. § 3730(e)(4)(A).[21] *Id.* at 24–27.

*The Public Disclosure Bar*

Importantly, not only does Atkinson explicitly concur with defendants' breakdown of his conspiracy claim, but he also agrees that the three components of that conspiracy that concern *Fidelity's* actions and omissions are based on public disclosures.[22]

19. In the body of his complaint, Atkinson describes Fidelity's role in the conspiracy as including a fourth action, namely its failure to inform the Navy that its security interests had not been perfected. *See* Complaint ¶ 70K. However, as stated, relator explicitly confirms the accuracy of defendants' characterization of his conspiracy allegation as involving only three actions undertaken by Fidelity. *See* Relator's Memo. at 44. Accordingly, I will consider defendants' characterization of plaintiff's conspiracy claim to be accurate.

20. Defendants label this "component" of the conspiracy "the marked-up March 15 Trust Indenture." Yet the marked up version of this agreement is simply the tangible basis for relator's inference that Fidelity convinced the Navy not to insist upon the inclusion of the "delivery provision" in the Trust Indenture. It is that alleged action on Fidelity's part, not the marked up draft of the Trust Indenture, that actually is part of the alleged conspiracy between Fidelity and Penn Ship.

21. Specifically, they contend that Fidelity's efforts to convince the Navy not to insist on the inclusion of the "delivery provision" were disclosed in 1995 during the course of a Senate investigation of the circumstances surrounding the Oiler contract "when Senate chief investigator [Eric] Thorson, in the course of [the] investigation, disclosed the Senate's copy of [the marked-up draft of the Trust Indenture] to [Atkinson's former co-relator Eugene] Schorsch." Def.'s Memo. at 25 (citing Appendix to Def.'s Memo ("App.") at 83–86, 160–74, 715–16). Defendants assert that Fidelity's failure to ensure the perfection of the Navy's security interests was publicly disclosed in a copy of Trust Indenture in its final form that was obtained by Schorsch via a December, 1990 Freedom of Information Act ("FOIA") request. *Id.* at 26 (citing App. at 171, 370, 500). Finally, Penn Ship and Fidelity posit, "Fidelity's non-signing of the financing statements was disclosed in documents and testimony that (1) were shown to Schorsch by ... Thorson during the Senate investigation in 1995; and (2) were exhibits at the Senate hearings in 1995." *Id.* (citing App. at 74.01–.04, 719–20 and 318, 796).

22. Two of the three specific public disclosures identified by defendants transpired after the inception of this action but before the filing of the third amended complaint, in which plain-

*See* Relator's Memo. at 44. Yet relator posits, in the formulaic terms first employed in *Springfield Terminal,* 14 F.3d at 655, that while Fidelity's actions and omissions together constitute the X component of the alleged fraud, the Y component-which plaintiff asserts to be the fact of *Penn Ship's* non-recording of the security instruments-has not been established by defendants as having been publicly disclosed. *See id.* Instead, he contends that he learned of Penn Ship's failure to perfect the Navy's security interests through Schorsch's "inspection of Delaware County real estate records," and that those records do not qualify under § 3730(e)(4)(A) as a public disclosure.[23] Relator's Memo. at 40. He avers that this inspection transpired sometime prior to March 4, 1993, the date on which he first alleged in the predecessor action that Penn Ship had failed to perfect the Navy's security interests.[24] Relator's Memo. at (citing App. at 717–19). Subsequently, plaintiff contends, the fact of Penn Ship's non-recording first was publicly disclosed in "a letter from the Navy to Mr. Schorsch, relating to his administrative appeal as to the disposition of a FOIA request, which letter is dated March 12, 1993." Relator's Memo. at 17. He argues that his pre-public disclosure allegations of Penn Ship's non-recording

> cannot be "based upon" subsequent public disclosures no matter how similar they may be, even under *Mistick,* and although the Predecessor Action was dismissed, the repetition of those same allegations in subsequent pleadings can not render them ... any more "based upon" the intervening disclosures than they were at the earlier time of their first assertion.

Relator's Memo. at 42. Because his allegation of Penn Ship's non-recording cannot be said to be "based on" any public disclosure, Atkinson concludes, the jurisdictional bar contained within § 3730(e)(4)(A) is inapplicable to the first count of his complaint.

Defendants respond to this argument in two ways. First, they assert that the *Springfield Terminal* approach is misplaced here, as the issue presented by Atkinson's first count is not whether the fact of a fraud has been publicly disclosed, but rather whether the elements of a conspiracy were revealed to the public. *See* Reply of Pennsylvania Shipbuilding Company to Relator's Opposition to the Motions to Dismiss for Lack of Subject–Matter Jurisdiction ("Reply") at 5. This assertion is well-founded. While both the commission of fraud against the government and conspiracies to do the same are actionable under the False Claims Act, *see* 31 U.S.C. § 3729(a)(1) and (3), these activities are essentially different in character. Whereas fraud, as indicated in *Springfield Terminal* and *Dunleavy,* is comprised of a false representation as to a fact and a true representation as to the same fact, a viable conspiracy claim under § 3729(a)(3) consists of a showing " '(1) that the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States, and (2) that one or

tiff's claims regarding Fidelity's actions in furtherance of the conspiracy first were advanced. However, as indicated *supra,* this does not preclude the applicability of the public disclosure bar.

23. Indeed, in *Dunleavy,* our Court of Appeals held that "administrative reports produced by non-federal government sources" do not constitute public disclosures within the meaning of § 3730(e)(4)(A). 123 F.3d at 745.

24. This allegation first was made by relator in the amended complaint he filed in the predecessor action. Relator's Memo. at 16, 38. This action was filed in February, 1992, amended once, and ultimately dismissed. *See Atkinson,* 2000 WL 1207162, at *5.

more conspirators performed any act to get a false or fraudulent claim allowed or paid.' " *Atkinson,* 2000 WL 1207162, at *7 (quoting *United States v. Hill,* 676 F.Supp. 1158, 1173 (N.D.Fla.1987)). Accordingly, the question before the court is not whether the Y component of a fraud has been publicly disclosed, but rather whether one or more of the "vital ingredients" of the conspiracy at issue in count one-i.e., the agreement and at least one act by one conspirator in furtherance thereof-"exist[ed] in the public eye" before they were alleged by relator. *Springfield Terminal,* 14 F.3d at 657; *see also United States ex rel. Long v. SCS Bus. & Technical Inst.,* 999 F.Supp. 78, 87 (D.D.C.1998) (applying *Springfield Terminal* in the context of a conspiracy claim, and concluding that the key question to be resolved in determining the applicability of the public disclosure provision is whether the "vital ingredients" of the conspiracy allegation had been publicly disclosed), *rev'd on other grounds,* 173 F.3d 870 (D.C.Cir.1999).

Defendants' second response to relator's argument, then, is that each of the essential elements of the conspiracy alleged by Atkinson had been publicly disclosed prior to being raised by plaintiff. Penn Ship and Fidelity note first Atkinson's failure to contest their arguments regarding the public disclosure of Fidelity's alleged acts and omissions. They then contend that Penn Ship's non-recording of the Navy's security instruments similarly had been publicly disclosed not only prior to relator's instant conspiracy allegation, but prior to Atkinson's March, 1993 allegation of non-recordation in the predecessor *qui tam* proceeding as well.[25] *See* Reply at 8–9. Specifically, they posit that this information was revealed in a January 11, 1993 letter from Navy Vice Admiral Kenneth C. Malley to Schorsch. *See id.* The letter was written in response to Schorsch's request for a meeting regarding his FOIA request, and stated in pertinent part:

> With regard to your request for a meeting, I do not believe that one is necessary since your position is clear from your comments to the Philadelphia Section of the Society of Naval Architects and Marine Engineers. Further, there is nothing to suggest that the Navy's interests were prejudiced as a result of the non-filing of the trust indenture.[26]

Reply at 9 (citing App. at 851). Defendants argue additionally that Penn Ship's non-recording was publicly disclosed several times after Atkinson's allegation of such in the previous action but before the filing of the instant *qui tam* suit. *See* Def.'s Memo. at 41 ("This omission was

**25.** Defendants actually so argue in the context of plaintiff's sixth claim, concerning the Trust Indenture (as opposed to the alleged conspiracy to not perfect the Navy's security interests thereunder). However, they incorporate those arguments by reference into those concerning relator's first claim, *see* Reply at 13, and accordingly I will consider these contentions as addressing Atkinson's first and sixth claims.

**26.** Relator addresses the significance of the Malley letter in his sur-reply, arguing that this letter does not disclose the fact of the non-filing because it merely was responsive to Schorsch's remarks to the Society of Naval Architects and Marine Engineers. *See* Plaintiff–Relator's Sur–Reply Memorandum ("Sur–Reply") at 3. Yet Atkinson also concedes that in the predecessor action he had termed this letter a "confirmation" of his allegation of non-recording. This previous characterization of the letter might judicially estop relator from contending in this suit that the Malley communique does not disclose Penn Ship's non-recording. However, I find it unnecessary to analyze the applicability of judicial estoppel principles to plaintiff's current argument. This is so because I conclude that, regardless of the Malley letter, the fact of Penn Ship's non-recording was publicly disclosed so as to render § 3730(e)(4)(A) applicable to the conspiracy claim.

publicly disclosed in documents produced by the Navy in its October, 1993 response to Schorsch's FOIA request, in [a March 24,] 1994 [Department of Defense Inspector General] ("DoD IG") Audit Report and in the 1995 Senate hearings." (citing App. 507, 509; 273; and 326)); *see also* Reply at 8.

It seems apparent that regardless of whether the Malley letter constituted a public disclosure-indeed, disregarding the very existence of this correspondence-relator's allegation in this action that Penn Ship failed to record the Navy's security instruments was, under *Mistick*, based on multiple public disclosures. While the parties contest the import of the Malley communique, there are several facts that are not in dispute, two of which are dispositive of this question. First, the fact of Penn Ship's non-recording was publicly disclosed within the meaning of § 3730(e)(4)(A) in the Navy's October 12, 1993 response to Schorsch's FOIA request and again in the DoD IG's March 24, 1994 Audit Report. *See* App. at 509, 273. Indeed, it is indisputable that both FOIA responses and government audit reports fall within the scope of that section. *See Mistick*, 186 F.3d at 383; § 3730(e)(4)(A). Second, plaintiff's current action subsequently was filed on December 5, 1994, at which time it alleged that Penn Ship failed to record the security instruments.

To reiterate, § 3730(e)(4)(A) reads as follows:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

This provision, on its face, permits no exception aside from the "original source" clause. To further reiterate, a claim is "based on" a certain disclosure when that disclosure supports or is "substantially similar to" the plaintiff's claim, *Mistick*, 186 F.3d at 386, i.e., "sets out . . . all of the essential elements of the *qui tam* action[ ] claim[ ]." *Id.* at 388. Accordingly, where a public disclosure precedes the relator's assertion in a given action of a claim featuring the information contained within that disclosure, the plaintiff's assertion is "based on" that disclosure. Plaintiff himself concedes that "the court need only compare the allegations in the relator's pleading to public disclosures that had been made as of the filing date."[27] Relator's Memo. at 41. Wholly beside the point, under the straightforward *Mistick* analysis, is a relator's own previous assertion of the relevant allegation or transaction in a prior action or his previous discovery of such via non-public means. While these considerations might have precluded the application of the public disclosure bar in the predecessor action, and although they certainly impact the original source analysis in this case, they do not alter the fact that the information was disclosed via a statutorily-enumerated means prior to its assertion in this action by relator.

To sanction Atkinson's reading of the statute would be to render the original source exception superfluous, thereby ignoring the concern that led the Third Cir-

27. While, as discussed above, the court's concern is with the date on which an assertion first appeared in a *qui tam* action (e.g., in an amended complaint), as opposed to the filing date, in this case the fact of Penn Ship's non-recordation was alleged in Atkinson's original complaint in this action. Accordingly, in this case, these dates are identical.

cuit to reject the interpretation of the public disclosure bar urged by the *Mistick* relator. *See Mistick,* 186 F.3d at 386. The problem with the assertion at issue in *Mistick*-namely that an action or claim is based upon a public disclosure only when the relator actually relied on that disclosure in garnering information to support his claim(s)-is that the original source exception would virtually never apply. Indeed, the exception obviously could not rescue the relator who falls within this constricted public disclosure provision, as a plaintiff who learns of certain information via a statutorily-delineated source is by definition not an original source. Stated alternatively, if the public disclosure bar were to not apply where the relator himself possessed the relevant information prior to the public disclosure-which itself preceded the relator's claim based on that information-the only plaintiffs who would fall within the public disclosure provision would be those who did not themselves possess the information prior to the disclosure, and thus, in all likelihood, are not original sources. *See United States ex rel. Merena v. Smithkline Beecham Corp.,* 114 F.Supp.2d 352, 358 (E.D.Pa.2000) ("[T]he last phrase of subsection (A) of § 3730(e)(4) could have stated: 'or the person bringing the action is an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided that information to the Government *before there is any public disclosure.*' Subsection (B) would then have become unnecessary and superfluous.") (emphasis original). Importantly, the FCA explicitly provides for cases in which the *qui tam* plaintiff possessed the relevant information regarding a given allegation or transaction before it was publicly disclosed. Yet it does so through the operation of the original source exception, not by precluding entirely the application of the public disclosure provision. *See* 30 U.S.C. §§ 3730(e)(4)(A) and (B); *Mistick,* 186 F.3d at 386 ("'Congress provide[d] an exception in the case of a relator who has actually derived his complaint from public information, that allows him to demonstrate that he already provided his independently obtained knowledge to the government before he filed suit ....'" (quoting *Findley,* 105 F.3d at 683)). Thus, the element of Atkinson's conspiracy claim that consists of Penn Ship's failure to record the Navy's security instruments under the Trust Indenture is based on the antecedent FOIA response and DoD IG Audit Report, as these disclosures unambiguously reveal the non-recordation.

Thus, each of the four components of plaintiff's conspiracy claim-that is, the three actions allegedly taken by Fidelity and Penn Ship's non-recording of the Trust Indenture-is based on a "public disclosure" as that phrase is defined in § 3730(e)(4)(A). Accordingly, it is necessary to determine whether Atkinson is an original source of this information.

*The Original Source Exception*

As stated, relator asserts that he learned of Penn Ship's non-recording through Schorsch's perusal of Delaware County real estate records. *See* Relator's Memo. at 17, 37, 42. He posits that although Schorsch is no longer a relator in this action, he may nonetheless be considered an original source of information learned by Schorsch when they were co-relators. *See id.* at 37. Atkinson also contends that on February 25, 1993, Schorsch voluntarily informed the government that the Navy's security interests had not been perfected, thereby fulfilling the second requirement for "original source" status under § 3730(e)(4)(B). *See id.* at 38.

Defendants raise several arguments against the proposition that Atkinson is an

original source of this information. As a preliminary matter, they contend that relator is precluded by "a [s]tipulation signed on behalf of himself and Schorsch and entered as an order by this [c]ourt and by the FCA itself" from asserting that he is an original source of any information that actually was learned by Schorsch. Reply at 1. Penn Ship and Fidelity specifically draw the court's attention to a June 21, 1999 agreement providing that Schorsch "shall not be deemed a relator in this action for any purpose," and that "[r]elator Paul E. Atkinson shall be deemed the sole relator in this action for all purposes." Reply at 2 (quoting App. 655, 657). Defendants assert that the impact of this stipulation is to remove Schorsch from the status of relator without any temporal limitation,[28] so that Atkinson cannot be considered an original source even of information learned by Schorsch during the period in which they were co-relators. Moreover, defendants allege, pursuant to the plain language of § 3730(e)(4), "the person bringing the action" must have "direct and independent" knowledge of the information underlying the allegation(s) or transaction(s) in question for the original source exception to apply. Because plaintiff-the only person bringing the instant action-learned of the non-recording through a former co-relator, they contend, the requisite directness is lacking. Reply at 2–3. Defendants also argue that "Atkinson actually derived the non-recording allegation from [Admiral Malley's January 11, 1993 letter] to Schorsch, not from Schorsch's examination of the Delaware County land records ..." Reply at 10. They further assert that even assuming that plaintiff did glean the fact that Penn Ship never recorded the security instruments from Schorsch's inspection of the Delaware County records, such makes relator, "at best, a mere gatherer of information and not an original source." Reply at 10 n. 8.

Upon considering defendants' arguments as to the inapplicability of the original source exception to relator's knowledge of Penn Ship's non-recordation, I find these contentions uniformly to be unpersuasive. First, defendants argue that by virtue of both the above-referenced stipulation and the operation of § 3730(e)(4)(B), Atkinson cannot be considered an original source of information unearthed during Schorsch's inspection of the Delaware County records. It is clear that in most False Claims Act cases in which the plaintiff is not the individual who actually obtained the information in question, the original source exception will not apply. *See, e.g., United States ex rel. Fine v. MK–Ferguson Co.,* 99 F.3d 1538, 1547 (10th Cir.1996); *Stinson,* 944 F.2d at 1160 (defining "direct knowledge" as that " 'marked by absence of intervening agency ...' " (quoting *Webster's Third International Dictionary* 640 (1976))). Yet the issue before the court-i.e., the effect of Schorsch's garnering the information on which the "non-recording" component of relator's conspiracy claim is based-is more subtle. Specifically, I am called upon to determine whether relator's knowledge of certain information can be said to be "direct" when such is based on information gathered by his former co-relator. While courts have spoken in general terms about both the need for, and the definition of, directness, as that concept is employed in § 3730(e)(4)(B), no tribunal of which I am aware has addressed the precise question currently at bar.

28. While Atkinson acknowledges the existence of this stipulation, he avers that this agreement, which states that "Schorsch 'is' no longer a relator, not that he never 'was' one, speaks prospectively only." Relator's Memo. at 5–6 n. 7. Defendants argue in response that the stipulation does not use the word "is," and in fact includes no temporal limitation.

Contrary to defendants' implication, one's status as an original source is not something that can be altered by subsequent events. If at Time 1 an individual (who later becomes a *qui tam* relator) genuinely has direct and independent knowledge of Fact A, then no ensuing event can change the fact that he possessed such knowledge at Time 1. While subsequent events could demonstrate that the individual never had direct and independent knowledge of Fact A in the first place, or could strip him prospectively of his knowledge of this fact,[29] they cannot retroactively alter his possession of such knowledge at Time 1. Accordingly, Schorsch's current presence within (or absence from) this suit could not affect the directness and independence of Atkinson's knowledge, and for this reason defendants' stipulation-based argument fails. While that agreement states that Schorsch "shall not be deemed a relator in this action for any purpose," App. at 655, this does nothing to change the fact that if Atkinson personally gained direct and independent knowledge of Penn Ship's non-recording by virtue of Schorsch's inspection of the Delaware County records,[30] then Schorsch's withdrawal from this action could not deprive Atkinson of his original source status. Conversely, if Atkinson did not possess original source status ab initio, then Schorsch's withdrawal from this action is similarly irrelevant; it is impossible to deprive an individual of something he never possessed in the first place. Accordingly, the pivotal question to be resolved is whether Schorsch's discovery of the fact of Penn Ship's failure to record the Navy's security instruments provided Atkinson with direct and independent knowledge of the same. This is the issue to which defendants' second argument pertains, and to answer this question it is necessary to explore the contours of the relationship between co-relators.

Unfortunately, this is a relationship that has received a paucity of attention from the courts and academic commentators. Perhaps the reason for this is that "[i]n theory, no False Claims Act case should have more than one relator for each complaint...." Efrem M. Grail, *"Qui Tam" Insurance & False Claims Act Settlement,* 11 Health Law. 16, 17 (1998). This is a product of the "first to file" rule, codified at 31 U.S.C. § 3730(b)(5), which creates a " 'race to the courthouse,' under which the *qui tam* relator who first brings suit may have later-filed actions brought by other *qui tam* relators dismissed, even if those cases are more factually developed," thereby avoiding the necessity of sharing recovery proceeds. *Id.* Indeed, on its face, the FCA's public disclosure provision contemplates *qui tam* actions as being brought by one individual. *See* § 3730(e)(4)(A) (discussing "the person bringing the action"). Yet as Grail explains, it is possible for relators to join forces. While this forces them to share any recovery, it enables them to avail themselves of the "additional investigation and ... more complete case development" that is made feasible by the presence of the other. *Id.* Accordingly, "[w]hile each relator would then get a lesser share, the total recovery on which their percentage is based could be greatly increased." *Id.*

As indicated *supra,* no court of which I am aware has determined whether a relator has direct and independent knowledge of information discovered directly by his co-relator. Yet keeping in mind the language and aim of the original source exception, I conclude that the answer to this

29. Such would be the case, for example, if a relator developed amnesia.

30. If Atkinson ever gained such direct and independent knowledge, this is the only time at which such possibly could have transpired.

question depends on the particular circumstances presented in a given case. For example, one might consider the sort of co-relator relationship envisioned by Grail. Let us suppose that 2 individuals who may or may not know each other-call them Ken and Ginger-undertake wholly independent investigations, during the course of which each discerns a separate fact which, when combined, form the X and Y elements of a complete fraud claim. Neither would have known of the component discovered by the other except through each other. They subsequently share their findings, provide this information to the government, and then institute a *qui tam* action as co-relators. In this case, it cannot be said that Ken, who discovered X, is an original source of Y. In the terms employed by the Third Circuit in *Stinson*, Ken knew of Y through an "intervening agency," 944 F.2d at 1160, namely Ginger (and her investigation in which Ken played no role).

In contrast to this sort of relationship, however, is the one that existed between Atkinson and Schorsch. Unlike Ken and Ginger, these individuals undertook a joint investigation, and functioned as a single disquisitive "agen[t]." *Stinson*, 944 F.2d at 1160; Relator's Memo. at 5–6 n. 7. During the course of this inquiry, both obtained information on which their joint claims were at least partially based. *See id.* Penn Ship and Fidelity argue that even within the context of this joint investigation, Atkinson cannot be considered an original source of information uncovered by Schorsch. Yet if this were so, there would be only two ways for co-relators to both be considered original sources of information revealed during the course of a joint investigation. First, both could physically conduct each aspect of the investigation at precisely the same time. Second, they each could do so at different times, with the first relator not informing the second of his findings. However, both of these options would effectively eliminate the possibility of conducting a genuine joint investigation, thereby removing any practical benefit of bringing a FCA claim with a co-relator. Where all of the effort required to conduct a complete investigation must be conducted by both investigators, such functionally transforms a joint investigation into two complete, independent investigations, each of which would suffice as the basis for a FCA claim. Moreover each of these options would impose a transparently pro forma procedural hurdle for *qui tam* co-relators that is neither consonant with the spirit nor compelled by the language of the original source exception. *See generally* § 3730(e)(4)(B); *Barth*, 44 F.3d at 703 ("The direct knowledge requirement was intended to avoid parasitic lawsuits by 'disinterested outsider[s]' who 'simply stumble across an interesting court file.' ") (citation omitted). Atkinson, as an integral participant in the collaborative investigation, simply cannot be deemed a "disinterested outsider," nor can his suit be considered "parasitic," as that word is used in *Barth*. Therefore, I conclude that knowledge gained directly and independently by a relator in the course of a joint investigation may also be said to have been learned directly and independently by his co-relator. Defendants' argument that Atkinson is not an original source because Schorsch was the one who actually perused the Delaware County real estate records consequently is unpersuasive.

As stated, defendants also argue that both Atkinson and Schorsch learned of Penn Ship's failure to record the Navy's security instruments through Vice Admiral Malley's January 11, 1993 letter, not from Schorsch's inspection of the Delaware County records. *See* Reply at 10–11. Relator contests this assertion, arguing that Malley's correspondence was instead responsive to allegations regarding the non-

recording made by Schorsch at a meeting of the Philadelphia Section of the Society of Naval Architects and Marine Engineers ("SNAME"). Sur–Reply at 2. It is worth reiterating at this point that, because this is a 12(b)(1) motion, I am entitled to resolve factual disputes that are potentially dispositive of the court's jurisdiction. *See Liberty Mut. Ins. Co. v. Ward Trucking Corp.,* 48 F.3d 742, 756 (3d Cir.1995) ("'When subject matter jurisdiction is questioned, the court must, of course, satisfy itself of its authority to hear the case, and in so doing, it may resolve factual disputes.'" (quoting *Prakash v. American Univ.,* 727 F.2d 1174, 1179–80 (D.C.Cir. 1984))).

After considering the parties' arguments, and the exhibits offered in their support, I conclude that defendants' allegation is non-meritorious, as evidenced by the face of the letter. Vice Admiral Malley began his correspondence by stating that he was replying to Schorsch's FOIA requests "and allegations [he] made to the [SNAME]." App. at 851. After commenting generally on the procedural posture of Schorsch's request, Malley stated:

> With regard to your request for a meeting, I do not believe that one is necessary since your position is clear from your comments to the [SNAME]. Further, there is nothing to suggest that the Navy's interests were prejudiced as a result of the non-filing of the trust indenture.

*Id.*

It is clear from the language of the letter that Schorsch had made the allegation of non-recording, based on the Delaware County record search, at the SNAME meeting. While it might be possible to argue that the word "further" at the beginning of the last sentence quoted above constitutes a linguistic transition from a discussion of Schorsch's comments at that meeting to one concerning the non-filing generally, I find another reading to be significantly more plausible. Indeed, the more natural interpretation of these lines is that they both were prompted by Schorsch's comments. Furthermore, while this fact alone is not dispositive, I find it telling that Malley referred to "*the* non-filing of the trust indenture." App. at 851 (emphasis added). It would seem that if this was a previously unrevealed fact, it would have been articulated in a less off-handed, more detailed manner, and likely would not have been disclosed in correspondence the purpose of which was to *deny* Schorsch's request "to discuss the recent partial denials of [his] FOIA requests." *Id.* Consequently, defendants' assertion regarding the Malley letter as the source of plaintiff's knowledge of Penn Ship's failure to record the Navy's security instruments wants for evidentiary support, and ultimately is unpersuasive.

Defendants articulate their fourth argument as to why plaintiff cannot be considered an original source of the fact that Penn Ship failed to record the Navy's security instruments as follows:

> Even if Atkinson could rely on him, Schorsch does not otherwise qualify as an original source for the "information" concerning the non-recording merely by reviewing indices at the Delaware County Courthouse. The information in the indices concerning the non-filing came through at least one intermediary-the courthouse employees who prepared the index.

Reply at 10 n. 8. Indeed, citing *Barth,* Penn Ship and Fidelity contend that because relator gleaned this information from public records, he is not an original source of such but rather is merely a "gatherer of information." *Id.* (citing *Barth,* 44 F.3d at 703–04).

In *Barth,* the relator union asserted original source status based on the discov-

ery by its business representative of information regarding the defendant corporation's false characterizations of the jobs performed by its employees (on which false characterizations the union's claims were based). The representative obtained this information in three ways: 1) by personally visiting the job site at which defendant's employees were working and observing the tasks they were performing; 2) by examining publicly-filed payroll records; and 3) by interviewing the defendant's employees. In concluding that the union did not enjoy original source status, the Eighth Circuit held that the representative "was, in effect, simply gathering information on behalf of the Union ... [and][a]s such, he was a recipient of information and not a direct source." 44 F.3d at 704 (citation omitted).

Yet the facts of the instant matter and the legal framework within which I must operate are, in two senses, distinguishable from those present in *Barth.* First, while examining payroll records is analogous to Shorsch's mode of discovery, an interview with another person is a paradigmatically indirect means of discerning information. Second, defendants' argument (and, it seems, the *Barth* holding) would nullify the possibility recognized in *Stinson* that non-insider "relators may also qualify [as original sources] if their information results from their own investigations." 944 F.2d at 1161. This point is articulated adeptly in *United States ex rel. Koch v. Koch Indus., Inc.,* 1995 WL 812134, at *11–12 (N.D.Okla. Oct. 6, 1995). Indeed, it is difficult to imagine how a relator could be a non-insider and gain information more directly than through an independent perusal of inanimate public records. While defendants argue that the courthouse employees who prepared the indexes were intervening agents between Schorsch and the information regarding Penn Ship's failure to record, this contention assumes too much. Unlike the human sources through whom the union representative garnered the relevant information in *Barth,* there is absolutely no indication that the Delaware County filing clerk(s) who prepared the index viewed ever interacted with Schorsch, much less that they ever informed him of the index's contents. As such, I cannot conclude that Schorsch's knowledge of Penn Ship's non-recording was indirect, i.e., that he learned of such from any source other than his own investigation of the index. *See generally Stinson,* 944 F.2d at 1161. Accordingly, defendants' fourth contention also is unpersuasive.

Because none of defendants' contentions as to relator's lack of original source status are meritorious, plaintiff is deemed to possess direct and independent knowledge of Penn Ship's non-recording of the Navy's security instruments. Insofar as this assertion is concerned, then, Atkinson may avail himself of the exception to the public disclosure bar that is codified at 29 U.S.C. § 3730(e)(4)(B).

*Count One as a Justiciable Conspiracy Claim*

Standing alone, however, the fact that plaintiff can surmount the public disclosure bar with respect to his knowledge of Penn Ship's non-recording is insufficient to preclude the dismissal of his first count pursuant to Fed.R.Civ.P. 12(b)(1). This is so because, as stated, *supra,* in order for a litigant to assert a viable conspiracy claim under the FCA he must allege that two or more entities conspired to defraud the United States and that " 'one or more conspirators performed any act to get a false or fraudulent claim allowed or paid.' " *Atkinson,* 2000 WL 1207162, at *7 (quoting *Hill,* 676 F.Supp. at 1173); *see also United States ex rel. Amin v. George Washington Univ.,* 26 F.Supp.2d 162, 165 (D.D.C.1998). Thus, plaintiff's contentions regarding Penn Ship's actions-from which he infers Penn Ship's agreement to de-

fraud the Navy-will not suffice under § 3729(a)(3). To establish the justiciability of his § 3729(a)(3) claim, relator must also demonstrate that the public disclosure provision does not bar his allegation that Fidelity was a party to the agreement to defraud the Navy. *See generally Frey & Son v. Cudahy Packing Co.*, 256 U.S. 208, 217, 41 S.Ct. 451, 65 L.Ed. 892 (1921) (noting that essence of a conspiracy is concerted action) (citing *Pettibone v. United States*, 148 U.S. 197, 203, 13 S.Ct. 542, 37 L.Ed. 419 (1893)).

Relator infers Fidelity's acquiescence in the agreement to defraud the United States from the three acts and omissions that allegedly comprised its participation in the conspiracy.[31] Thus, given Atkinson's concession that information regarding each of these acts and omissions was publicly disclosed prior to being asserted in his first count, *see supra*, the question on which the justiciability of this count turns is whether plaintiff is an original source of any of this information. In this vein, defendants posit that relator's knowledge of Fidelity's alleged acts and omissions in furtherance of its conspiracy with Penn Ship is not direct and independent, but rather is based on various public disclosures.[32] *See id.* Consequently, they

31. Because Atkinson can rely on his allegation that Penn Ship performed an act to get a false claim paid, he must allege only that Fidelity agreed with Penn Ship to defraud the Navy. Notably, however, he infers this agreement from acts taken by Fidelity that, if coupled with an underlying agreement to defraud, would themselves suffice as an act in furtherance of that agreement such as would give rise to a viable § 3729(a)(3) claim.

32. Defendants allege specifically that plaintiff learned of each of Fidelity's alleged acts or omissions as follows: First, as for Fidelity's efforts to convince the Navy not to insist on the "delivery provision," relator learned of this from Schorsch, who in turn derived this information from the Senate Permanent Subcommittee on Investigations. Def.'s Memo. at 25 & n. 12. Second, regarding Fidelity's failure to ensure that Penn Ship recorded the security instruments, plaintiff learned of this from Schorsch, who learned it from the Delaware County record inspection and a U.S. Coast Guard abstract of title for the Sun 800 floating derrick. *Id.* at 26 & n. 13. Third, as for Fidelity's failure to sign the security instruments, Atkinson learned of this too from Schorsch, who obtained this information "when he was allowed to view a transcript of the deposition of Fidelity employee Terry McPoyle ... by Senate chief investigator Thorson...." *Id.* at 27 & n. 14. Atkinson does not contest these assertions, *see* Relator's Memo. at 44, and therefore I will assume them to be accurate.

With the exception of the Delaware County record inspection, all of Schorsch's sources constitute public disclosures within the meaning of § 3730(e)(4)(A). While that section refers specifically to congressional investigations and civil hearings, thus encompassing the uncontested sources of relator's first and third assertions regarding Fidelity, it does not expressly include or exclude federal title abstracts. However, such constitutes an "administrative report" within the meaning of § 3730(e)(4)(A). In *Mistick*, the terms "administrative" and "report," as those words are used in § 3730(e)(4)(A), were construed. The Third Circuit stated that while only federal, as opposed to state, administrative reports fall within the scope of that section, a report is administrative if it " 'originate[s] with a department of the federal government and constitute[s] official federal government action.' " 186 F.3d at 383; *see also Dunleavy*, 123 F.3d at 745. These criteria are satisfied in the context of a U.S. Coast Guard abstract of title, as the Coast Guard unquestionably is a federal entity, and an abstract of title certainly is an official Coast Guard document. Moreover, a federal title abstract also constitutes a "report," which "is defined as, among other things, 'something that gives information' or a 'notification'...." *Id.* (quoting *Webster's Third New International Dictionary* 1925 (1971)). An abstract of title is itself defined, in pertinent part, as "[a] condensed history of the title to land, consisting of a synopsis or summary of the material or operative portion of all the conveyances ... which in any manner affect said land." *Black's Law Dictionary* 10 (6th ed.1990). This then is a document that notifies any interested party as

assert, plaintiff cannot be considered an original source of any of this information under *Stinson*. *See* 944 F.2d at 1160 ("[A] relator who would not have learned of ... information absent public disclosure d[oes] not have 'independent' information within the statutory definition of 'original source.' ").

Upon analyzing defendants' arguments that relator is not an original source of his information regarding Fidelity's various acts and omissions, I conclude that these assertions are well-founded except insofar as they pertain to the source of Atkinson's knowledge of one of the omissions allegedly attributable to Fidelity. Specifically, defendants aver that plaintiff learned from Schorsch that Fidelity failed to ensure Penn Ship's recordation of the security instruments, and that Schorsch in turn learned this from the Delaware County record inspection and a U.S. Coast Guard abstract of title for the Sun 800 floating derrick. *See supra* note 30; Defs.' Memo. at 26 & n. 13. While this abstract of title constitutes a public disclosure under § 3730(e)(4)(A), *see supra* note 30, the county records do not. *See Dunleavy*, 123 F.3d at 745. Accordingly, if plaintiff ultimately learned of Fidelity's failure to ensure that Penn Ship perfected the Navy's security interests from the records, such would invalidate defendants' *Stinson*-based argument as to this particular information.

In fact, not only do defendants affirmatively contend that plaintiff learned of this failure on Fidelity's part through Schorsch and his record inspection, but moreover, as a matter of logic plaintiff must have derived his knowledge of Fidelity's omission through Schorsch's inspection of the Delaware County records. Indeed, it necessarily is the case, given that Atkinson learned from these records (through Schorsch as an intermediary) that Penn Ship failed to record the security instruments, that he also learned from them that Fidelity failed to ensure that Penn Ship had recorded those instruments. This is so regardless of whether this information also was conveyed by the Coast Guard title abstract.[33]

Defendants' argument that relator is not an original source of this particular omission by Fidelity consequently is unpersuasive despite being uncontested. By contrast, the sources identified by defendants-and undisputed by relator-as those from which Atkinson learned of Fidelity's two other acts and omissions in furtherance of the conspiracy are public disclosures under § 3730(e)(4)(A). *See supra* note 30. Under *Stinson*, the knowledge that relator gleaned from these disclosures is not independent, and he cannot be considered an original source of the same. *See* 944 F.2d at 1160.

To conclude, plaintiff can be considered an original source of his information concerning both Penn Ship's failure to record the Navy's security instruments and Fidelity's failure to ensure such recordation. Importantly, relator infers the very existence of an agreement between Penn Ship and Fidelity to defraud the Navy from these alleged omissions. Moreover, these

to encumbrances on a given piece of property, and as such is a "report" under *Mistick*.

To the extent that Schorsch learned of Fidelity's alleged acts and omissions in furtherance of the conspiracy via these public disclosures-a class from which the Delaware County records are excluded, *see Dunleavy*, 123 F.3d at 745-his knowledge of the information revealed therein cannot be considered "independent," *Stinson*, 944 F.2d at 1160, and consequently he (and, by logical implication, Atkinson) is not an original source of the same.

33. In reality, this abstract could not have conveyed to relator the fact that Fidelity failed to ensure that Penn Ship record each of the Navy's security instruments under the Trust Indenture, as the abstract pertained only to the Sun 800.

omissions both would suffice as an act by a conspirator in furtherance of such an agreement. Accordingly, these alleged incidents of nonfeasance suffice as bases for a cognizable § 3729(a)(3) claim.[34] Plaintiff's conspiracy allegation thus is justiciable insofar-and only insofar-as it is based on Penn Ship's non-recording of, and Fidelity's failure to ensure that Penn Ship had recorded, the Navy's security instruments.[35]

*Counts Two and Three*

These counts pertain to Penn Ship's September 30, 1984 and December 31, 1984 financial statements, respectively. Plaintiff avers that Penn Ship, in submitting these statements to the Navy, knowingly failed to disclose its guaranties of Levingston's worker's compensation premiums and to set forth a loss contingency relating to the impairment of its Levingston receivable. In awarding the Oiler contract to Penn Ship, relator continues, the Navy relied on the representations contained in these statements. Accordingly, he concludes, the Navy's acquiescence in that agreement was fraudulently induced, as was its compensation of Atkinson pursuant thereto.

In response to defendants' arguments regarding the court's subject matter jurisdiction over these claims, however, relator concedes that "the terms of the financial statement[s], and the bas[e]s for concluding [their] intentional falsity, are based on public disclosures of which Atkinson is not the original source." Relator's Memo. at 44–45. Accordingly, these counts will be dismissed pursuant to Fed.R.Civ.P. 12(b)(1).

*Count Four*

As formulated prior to the drafting of relator's third amended complaint, this count, brought against Penn Ship pursuant to § 3729(a)(2), entailed two essential elements. First, relator correctly asserted that Penn Ship's best and final offer ("BAFO")-the one that ultimately proved lowest, and resulted in the award of the Oiler contract-featured a target price of $848,105,300 for nine Oilers. Second, plaintiff asserted that Penn Ship knew at the time that it submitted this offer that its target price was intentionally and deceptively low, as it disregarded both the cost of architectural drawings of the ships and the expense associated with the delay that the production of these schematics would occasion. This count, however, underwent a significant transformation between plaintiff's second and third amended complaints. Indeed, Atkinson currently posits not only that Penn Ship's BAFO intentionally understated the costs of completing the ships,[36] but also that at the time of its bid Penn Ship knew that it was likely to default on its obligations under the Oiler contract. Complaint ¶ 107.

34. Fidelity argues in the context of its motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) that nonfeasance is not actionable under the FCA. I address, and ultimately reject, this argument, *infra*.

35. Because these allegations encompass acts or omissions undertaken by both Penn Ship and Fidelity, the requisite concerted action is present. Moreover, although § 3730(e)(4)(B) imposes the additional requirement that a *qui tam* plaintiff "voluntarily provide[ ] the information to the Government before filing an action under [the FCA]," defendants do not dispute Atkinson's assertion that he "reported what he learned to various government agencies as he learned it...." Complaint ¶ 14. Accordingly, I conclude that this requirement has been satisfied by relator.

36. Relator asserts that Penn Ship's BAFO was a product of a practice known as "buying in," whereby a contractor submits a bid that knowingly understates anticipated costs as a means of securing a contract, "with the intention of increasing the contract price, through overruns or contractual modifications or both, after the contract has been awarded." Complaint ¶ 59.

This, relator asserts, is evidenced by the actions it undertook to defeat the trust indenture, i.e., failing to record the Navy's security instruments thereunder. *Id.* For both of these reasons, he argues, the Navy's agreement to the Oiler contract was fraudulently induced, as were all payments made by the Navy pursuant thereto.

As stated, *supra,* certain claims within plaintiff's second amended complaint were dismissed pursuant to Fed. R.Civ.P. 12(b)(6) by an order of this court dated August 24, 2000. As to Penn Ship, relator was free to amend counts one, two, six, seven, ten, eleven, thirteen and fourteen of his complaint so as to cure the deficiencies therein identified in the memorandum accompanying the August 24, 2000 order. Yet as defendants note, the leave to amend granted by the court to Atkinson pertained *only* to those claims listed above. *See* Reply at 14 n. 12; *Atkinson,* 2000 WL 1207162, at *23. Count four was not discussed and no leave to amend this count was requested or granted. In amending count four as well, then, Atkinson has exceeded the bounds of the leave granted to him.[37]

It is axiomatic that once a responsive pleading has been served, a pleading may be amended "once as a matter of course at a time before a responsive pleading is served," and that in all other circumstances amendments may be made "only by leave of court or by written consent of the adverse party...." Fed.R.Civ.P. 15(a); *Berkshire Fashions, Inc. v. M.V. Hakusan II,* 954 F.2d 874, 886 (3d Cir. 1992). Although a motion to dismiss does not qualify as a "responsive pleading" so as to preclude a plaintiff from amending his complaint as a matter of right, *see Centifanti v. Nix,* 865 F.2d 1422, 1431 n. 9 (3d Cir.1989), by its terms Rule 15(a) permits only one such amendment. In this case, Atkinson availed himself of his one guaranteed opportunity to amend on June 5, 1997. The present complaint represents the third amendment to relator's complaint, and as such could properly have been undertaken only in conformity with the terms of Rule 15(a). However, not only did Atkinson fail to obtain leave from the court to amend count four, but moreover defendants never consented to the amendment; in fact, they specifically argue against its propriety. *See* Reply at 14–15 n. 12. As such, I conclude that the amendment is improper, and the court will evaluate for subject matter jurisdiction relator's fourth count as it appeared in the second amended complaint.

In moving to dismiss, defendants note a panoply of occasions on which both essential elements of claim four (in its pre-amended form) were disclosed through the means listed in § 3730(e)(4)(A).[38] Def.'s Memo. at 33–35. They also aver that Atkinson is not an original source of this information. *See id.* at 35–36. Relator responds by contending, in full, as follows:

> This Count rests on two alternative bases. One is that the Oiler Contract was obtained without disclosing a substantial likelihood of non-performance and default.[39] This is evidenced by the

37. Claim four, as articulated in plaintiff's second amended complaint, pertained to both Penn Ship and Sun Ship. Since Sun is no longer a party to this action, the amendment of this claim necessarily transpired as to Penn Ship only.

38. Because this count advances a claim sounding in fraud as opposed to conspiracy, it necessarily is comprised of an X and Y element. In particular, the X element (or misrepresented state of facts) is the BAFO itself. The Y element (or true state of facts) is that Penn Ship knew that this offer was unreasonably low.

39. This is the "basis" that was added via amendment in the third amended complaint. The "alternative" basis to which Atkinson refers is that Penn Ship knew that its BAFO understated its costs.

> contemporaneous trust indenture fraud intended to defeat the Navy security interests in that anticipated event.
>
> For the reasons stated above, the non-recordation "y" necessary to support this claim was not the subject of a prior public disclosure and, in any event, Atkinson was an "original source" of it.
>
> Accordingly, the Court may retain jurisdiction over [ ] Count Four on this basis, irrespective of whether the alternative basis of "buying in" [that is, deliberately understating costs in an effort to procure a contract] and the related architectural drawing allegations were the subject of a public disclosure.

Relator's Memo. at 45.

Relator thus effectively has elected not to contest defendants' arguments regarding the applicability of the public disclosure bar to his allegations regarding Penn Ship's knowledge that its bid understated the cost of completing the Oilers, and instead has focused entirely on whether that bar applies to its contention that Penn Ship knew it was likely to default. Yet, as stated, the amendment of the second amended complaint to include this allegation was non-permissive, and I accordingly will not consider it.

Thus, the court is confronted with defendants' unrefuted allegations regarding the applicability of the public disclosure provision. Upon considering the exhibits submitted by defendants in support of their contentions, I conclude that, under *Mistick,* plaintiff's fourth count is based on allegations that were publicly disclosed prior to the inception of this suit. Specifically, a July 30, 1989 article in the Philadelphia Inquirer explicitly referred to Penn Ship's "low bid" as a factor contributing to the failure to complete the Oilers. App. at 415. Moreover, the March 25, 1994 DoD IG Audit Report concluded that "[t]he Penn Ship target costs and price proposals were unreasonably low compared with the other proposals." App. at 266. Notably, this audit report also disclosed the X element of Penn Ship's alleged fraudulent misrepresentation, namely the fact and amount of Penn Ship's BAFO. *See* App. at 267–68. Both the news media and government audit reports qualify as public disclosures under the plain language of § 3730(e)(4)(A). Because these disclosures predated the filing of this action, relator's fourth count may be said to have been based on them, *see Mistick,* 186 F.3d at 388, and thus, unless he is an original source of the information they conveyed, the court is without jurisdiction over his fourth count.

In his own deposition testimony, however, Atkinson concedes that he is not the original source of the fact that Penn Ship's BAFO omitted the cost of architectural drawings. *See* App. at 203 (Atkinson testifying that he learned of such through "the [government's] audit report, the pre-award survey ... the first time I saw it was I think in the audit report ... I'm not sure of that, but the pre-award survey"). In response to the question of where he obtained the non-financial portion of the pre-award survey, Atkinson stated: "I don't know. I imagine from the Senate." *Id.* at 163. Whether he learned of the omission of the cost of architectural drawings through the audit report or the pre-award survey provided to him during the course of the Senate's investigation, it is apparent that he discerned this information through a source that qualifies as a public disclosure under § 3730(e)(4)(A). Therefore, his knowledge of such cannot be said to be independent, *Stinson,* 944 F.2d at 1160, and he consequently cannot be considered an original source of the same. § 3730(e)(4)(B). Atkinson's fourth count accordingly will be dismissed pursuant to Fed.R.Civ.P. 12(b)(1).

*Count Five*

This count revolves around the March 15, 1985 Weller letter, and the intentional misrepresentations that allegedly were contained therein. Complaint ¶ 64. Atkinson focuses in particular on three distinct statements made by Weller to Pigott.[40] He contends that each of these assertions was made for the purpose of inducing the Navy to award the Oiler contract to Penn Ship, and that each was knowingly false. *Id.* ¶ 65. As such, he posits, these representations constitute bases for recovery under § 3729(a)(2). Specifically, by plaintiff's account, Weller stated that 1) "significant cost overruns" were a "highly unlikely event," when in fact Penn Ship's bid knowingly understated the costs associated with the Oilers' completion; 2) the trust created by the Indenture would be "irrevocable," when that agreement actually permitted Penn Ship to strip the trust of its assets;[41] and 3) the trust res would consist of "a security interest and/or mortgage in the entire Penn Ship facility" when "in fact, approximately seven critical acres of the shipyard-including its administrative offices and the buildings in which they were housed-were deliberately excluded." *Id.* ¶ 65(iii). In the terms employed by the *Springfield Terminal* court, the elements of these alleged misrepresentations may be set forth as follows:

a. X—Weller states that cost overruns are unlikely

   Y Cost overruns actually were anticipated by Penn Ship

b. X—Weller states that the trust is irrevocable

   Y The trust could be defeated by selling the assets that comprised its corpus during the 15 day window

c. X—Weller states that the trust res would be comprised of the entire Chester yard

   Y The trust res excluded seven critical acres of the Chester yard

Defendants argue that each component of these representations was publicly disclosed prior to being asserted by relator as a basis for relief,[42] and that Atkinson is not an original source of any of this information. *See* Def.'s Memo. at 37–40. In particular, defendants aver that besides being disclosed individually through various means, each of the X components listed above was revealed publicly when the Weller letter itself was given by Senate Chief Investigator Thorson to Schorsch during the Senate investigation. *See id.* at 37 (citing App. at 473, 500). Defendants further argue that plaintiff ultimately learned of the facts that comprise these X components from this public disclosure, and that he therefore cannot be labeled an original source of the same. *See id.* at 38–40.

As for the Y component of the first alleged misrepresentation, i.e., that Penn Ship did anticipate cost overruns, defendants contend that this is merely another

40. To reiterate, Christopher Pigott was a financial analyst of Naval Sea Systems Command, and was a member of the team responsible for the financial analysis of Penn Ship's Trust Indenture proposal. Complaint ¶ 64.

41. Relator asserts that the trust contained a loophole in the form of a fifteen day "window" provision, whereby the Navy was obligated to wait fifteen days after a declaration of Penn Ship's default under the Oiler contract before it was permitted to foreclose on the mortgages comprising the trust res. He posits that this provision thus created a two week period during which "Penn Ship and its affiliates might defeat the Trust by simply selling the underlying properties. Indeed, some of the property subject to the Trust was, in fact, sold during the duration of the Trust." Complaint ¶ 65(ii).

42. The allegations concerning the Weller letter first were made by Atkinson in the second amended complaint, filed on January 4, 1999.

way of saying that Penn Ship's BAFO knowingly understated its costs, which was the subject of Atkinson's fourth count. *Id.* They repeat the arguments made in the context of that count in support of the proposition that this information was publicly disclosed prior to its appearance in the present action. Defendants also incorporate by reference the contentions made in the context of the fourth count regarding the source(s) of relator's information concerning the likelihood of cost overruns. *See id.* at 36. Penn Ship and Fidelity further allege that the Y element of Weller's second asserted misrepresentation, that the Trust Indenture could be defeated by selling the assets that comprised the trust res, "was disclosed in the Trust Indenture itself, which had no prohibition on sale, and the security instruments themselves, which had provisions specifically permitting a sale of the assets." *Id.* at 38 (citing App. at 699, 703, 705, 708, 710). Defendants argue that Atkinson learned of this information when he received the Trust Indenture from Schorsch, who had obtained it and the security instruments pursuant to a December, 1990 FOIA request. Finally, defendants posit that the Y element of Weller's third alleged misrepresentation, that the trust res excluded seven acres of the Chester yard, was contained in a mortgage attached as Exhibit A to the Trust Indenture. *Id.* This mortgage, they contend, was publicly disclosed in May, 1993 in the Navy's response to Schorsch's FOIA request. *Id.* at 38–39 (citing App. at 25–28, 500, 701). They also note that the mortgage was an exhibit at the 1995 Senate hearings. *Id.* at 39.[43] Penn Ship and Fidelity aver that Atkinson learned that the mortgage excluded seven acres of shipyard property by examining that agreement itself, which had been obtained by Schorsch via his FOIA request, and that he consequently is not an original source of this information. *Id.* (citing App. at 26–27, 208–09, 361, 500).

Relator responds to these arguments by asserting as follows:

> [The fifth] count survives because the third respect in which the Weller letter was false-its misrepresentation that the trust indenture would convey the entire shipyard property-was not publicly disclosed and, further, because Atkinson was an original source of the information demonstrating that the misrepresentation was false.

Relator's Memo. at 45. In so contending, plaintiff fails to contest (and implicitly concedes the validity of) defendants' assertions regarding the applicability of the public disclosure bar to Weller's first two asserted misrepresentations. He also does not dispute their contention that the X element of Weller's third alleged misrepresentation was publicly disclosed. Instead, relator contests defendants' jurisdictional argument only insofar as it applies to the Y element of the third statement in question, i.e., that the Trust Indenture excluded seven critical acres, by asserting that such was not publicly disclosed and that, in any event, he is an original source of this information.

Specifically, although Atkinson does not dispute that the mortgage accompanying the Trust Indenture was publicly disclosed, he contends that that document did not reveal that the excluded acreage was part of the Chester yard. *See* Relator's Memo. at 18. He states: "Even the metes and bounds property description annexed to the mortgages produced as exhibits to the trust indenture under FOIA ... disclosed only that certain property was excluded,

**43.** Defendants also assert that the exclusion of the seven acres was disclosed during the course of a lawsuit filed by Schorsch in the United States District Court for the District of Colorado. *See* Reply at 19; Response to Sur-Reply at 6.

not that the excluded property included part of the shipyard. For all that could be discerned from that description, the exclusion represented only a non-shipyard portion of the properties reflected by the overall parameters of the metes and bounds of a greater land subdivision that included the shipyard-a remainder that was properly excluded as not being part of the shipyard facility." *Id.* He avers that specialized knowledge or personal familiarity with the yard, such as he possessed by virtue of his experiences as president of Sun Ship, was required to discern that the excluded acreage was shipyard property. It is this first hand knowledge, he contends, that is the source of that information. *See id.* at 18–19, 38.

Defendants counter this argument by simply pointing to the text of the mortgage disclosed by the Navy on May 15, 1993, and noting that this document, on its face (indeed, in a separate paragraph labeled "LESS AND EXCEPTING THEREFROM"), delineates in detail the metes and bounds of the excluded seven acres. *See* Reply at 17; Response to Sur–Reply at 5. They note that both Atkinson and Schorsch have acknowledged the obviousness of this paragraph. *See id.* (citing App. at 26, 208–09). As for the question of whether Atkinson may be considered an original source of the fact that the excluded acreage was part of the Chester yard, defendants assert that even if the mortgage did not clearly convey this information, the fact that specialized knowledge was required to interpret data that already was present in the public sphere does not render an individual possessing such knowledge an original source of that information. *Id.* at 18 (citing *Stinson,* 944 F.2d at 1160).

Upon evaluating the parties' arguments, it is evident that the public disclosure bar precludes the court from exercising jurisdiction over relator's fifth count. First, as relator concedes, the allegations underlying both of Weller's first two alleged misrepresentations were publicly disclosed, and Atkinson is not an original source of this information. Indeed, each of the X elements of the alleged fraudulent representations delineated above was revealed when the Weller letter was given in 1995 by Thorson to Schorsch during the Senate investigation, and again when that letter was "published as a part of the [Senate] Subcommittee report in October 1995." App. at 500; *see also* § 3730(e)(4)(A) (classifying congressional reports as public disclosures). Moreover, the Y components of Weller's first two alleged misrepresentations-that cost overruns actually were anticipated by Penn Ship and that the trust could be defeated by selling the assets that comprised its corpus during the 15 day window-were made public in the March 25, 1994 DoD Audit Report, and in the mortgage turned over by the Navy to Schorsch in response to Schorsch's FOIA request, respectively. *See* App. at 270 ("[T]he Penn Ship proposed target costs and price were unreasonably low and were not in a competitive range ...."); *id.* at 699 (providing for the sale of trust assets). As stated, both government audit reports and FOIA responses constitute public disclosures within the scope of § 3730(e)(4)(A).

Nor is relator an original source of this information. As to Weller's statements themselves, i.e., the X elements of his allegedly false representations, plaintiff learned of such by reading the letter. Because this document was obtained by Schorsch from Thorson during the Senate investigation, Schorsch's (and thus Atkinson's) knowledge of such is not independent, as it must be if original source status is to be achieved. *See* § 3730(e)(4)(B); *Stinson,* 944 F.2d at 1160. Although this fact alone precludes relator from being considered an original source of any assertion of fraud which features one of Weller's

statements as one of its critical elements, *see Mistick,* 186 F.3d at 388–89, I note also that plaintiff is not an original source of the Y element of either of Weller's first two alleged false representations. He is not an original source of the information concerning the likelihood of cost overruns for the reasons delineated in the context of relator's fourth count. He is not an original source of the information regarding the possibility of defeating the Trust Indenture by selling its res because he learned of such by examining the Trust Indenture itself, which explicitly provided for the sale of assets comprising its corpus.[44] *See* App. at 699. Because the Trust Indenture was disclosed pursuant to a FOIA request, i.e., was publicly disclosed within the meaning of § 3730(e)(4)(A), relator's knowledge of such is not independent. *See Stinson,* 944 F.2d at 1160. Consequently, the court is without jurisdiction over the fifth count of his complaint insofar as it is predicated on either of Weller's first two alleged false statements.

This leaves only the Y component of Weller's third alleged misrepresentation, namely the fact that the mortgage excluded seven acres of the Chester yard. Notwithstanding plaintiff's arguments to the contrary, however, this fact also was publicly disclosed. It is undisputed that the metes and bounds of the excluded acreage are contained in the mortgage, which was revealed in response to Schorsch's FOIA request. Relator's Memo. at 18; App. at 701. It also is settled that responses to FOIA requests are public disclosures. *See Mistick,* 186 F.3d at 383. Thus, the only question is whether the property description contained in the mortgage sets forth the Y element of Weller's third alleged false representation. *See id.* at 388 ("[A] *qui tam* action is 'based upon' a qualifying disclosure if the disclosure sets out either the allegations advanced in the *qui tam* action or all of the essential elements of the *qui tam* action's claims.").

I conclude that the Y element of relator's claim regarding Weller's third statement-that the mortgage excluded seven acres of the Chester yard-was disclosed in the mortgage itself. Indeed, plaintiff never disputes defendants' assertion that the metes and bounds contained within the mortgage refer precisely to the area excluded. His only contention is that his specialized knowledge was required to conclude that this acreage was within the shipyard. Yet the fact that the mortgage never employed the term "shipyard," or otherwise specified the nature of the area excluded, does not mean that the nature of that area as shipyard property was not revealed. This is so even if plaintiff is correct that such would not have been discernible to anyone lacking his specialized knowledge, as all of the information needed to discern that the metes and bounds description contained in the mortgage described shipyard acreage was made public through a mean delineated in § 3730(e)(4)(A). Accordingly, relator added no information to the public sphere-he merely interpreted that which already had been revealed. The D.C. Circuit addressed an analogous circumstance in *Springfield Terminal,* in which it held:

> [T]here may be situations in which all of the critical elements of fraud have been publicly disclosed, but in a form not accessible to most people, *i.e.,* engineering blueprints on file with a public agency. Expertise in the field of engineering would not in itself give a *qui tam* plain-

44. While Atkinson does not explicitly confirm this as his source of this information, he does not contest defendants' assertion that he learned of the possibility of selling trust assets through a perusal of the agreement itself. *See* Relator's Memo. at 45. Accordingly I will assume that defendants' assertion is accurate.

> tiff the basis for suit when all the material elements of fraud are publicly available, though not readily comprehensible to nonexperts.

14 F.3d at 655. Paralleling the argument of the *Springfield Terminal* relator, Atkinson claims not that he uniquely was familiar with the language contained in the mortgage's exception, but rather that, once he learned of such via a public disclosure, he uniquely was familiar with the property to which that language referred. This places him squarely in line with the court of appeals's hypothetical engineer, and renders his argument against the applicability of § 3730(e)(4)(A) unpersuasive.

Moreover, relator's argument that his knowledge was not generally attainable, as is that of an engineer or a cryptographer, *see* Sur–Reply at 6, is irrelevant. Just as anyone with an advanced degree in those fields could understand schematics or decipher a coded document, anyone with intimate knowledge of the Chester Yard could discern from the Navy's public disclosure that the mortgage excluded seven acres of the shipyard. Even if his degree of familiarity with the shipyard was unique, this does not affect the analysis; by that rationale, an engineer who possessed an average ability to interpret blueprints would lack the basis for a FCA suit, yet this principle would yield where the schematics are so complicated that only an exceptionally skilled engineer is able to interpret them. However, no such limitation is suggested by the *Springfield Terminal* court. Accordingly, just as the complexity of the engineer's interpretive task does not alter the fact that it is essentially interpretive, the actions undertaken by Atkinson also were interpretive in nature, even if there were few others who knew that the mortgage's metes and bounds described shipyard property. In sum, because the Y component of Weller's third alleged misrepresentation is comprised merely of plaintiff's interpretation of information contained in a publicly disclosed document, I conclude that this element falls within the bar of § 3730(e)(4)(A).

Nor is relator an original source of his information regarding the exclusion of the seven acres of shipyard property. This conclusion is supported by the Third Circuit's holding in *Stinson,* in which our Court of Appeals analyzed a hypothetical that is analogous to the case of the engineer discussed by the D.C. Circuit in *Springfield Terminal.* Notably, instead of construing this hypothetical as bearing on the applicability of § 3730(e)(4)(A), the Third Circuit viewed it as relevant to the issue of whether the relator could be considered an original source of the information that he interpreted. The court stated:

> [To be an original source, t]he relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation. If the latter were enough to qualify the relator as an "original source," then a cryptographer who translated a ciphered document in a public court record would be an "original source," an unlikely interpretation of the phrase.

944 F.2d at 1160. Atkinson, who learned of the exclusion of shipyard property by examining the mortgage, is no less analogous to our Court of Appeals's imaginary code breaker than he is to the D.C. Circuit's engineer. As such, plaintiff cannot be considered an original source of the fact that it was shipyard property that was excluded from the mortgage.

Moreover, because relator would not have known that any property was excluded from the mortgage, much less that the excluded acreage was part of the shipyard, save through an examination of that document, he cannot be considered an original

source. This is so because the mortgage was obtained by Schorsch through a FOIA request which, under *Mistick,* constitutes a public disclosure for purposes of § 3730(e)(4)(A). *See* 186 F.3d at 383. As such, Atkinson's knowledge cannot be considered independent. *See Stinson,* 944 F.2d at 1160 ("[A] relator who would not have learned of the information absent public disclosure d[oes] not have 'independent' information. . . .").

Thus, each element of Weller's three alleged misrepresentations was publicly disclosed, and Atkinson is an original source of none of the information underlying them. Accordingly, his fifth count will be dismissed pursuant to Fed.R.Civ.P. 12(b)(1).

*Count Six*

Plaintiff's sixth count, like his first, focuses on the Trust Indenture. Yet in count six, relator alleges not a conspiracy between Penn Ship and Fidelity to defeat the Navy's security interests under the Indenture, but rather that Penn Ship made the knowingly false representation that it would record the security instruments provided for by that agreement. As such, this count is brought against Penn Ship pursuant to 31 U.S.C. § 3729(a)(2), not against both Penn Ship and Fidelity pursuant to § 3729(a)(3). Additionally, whereas relator's conspiracy allegation entailed four components (i.e., the three acts or omissions on Fidelity's part, plus Penn Ship's failure to perfect the Navy's security interests), count six fits squarely within the X + Y = Z mold. The X element, or alleged false statement, is that Penn Ship represented in the Trust Indenture that it would record the Navy's security instruments thereunder. The Y element, or true state of facts, is that Penn Ship had no intention of doing so when it agreed to the terms of the Indenture.[45]

Relator concedes that the X element of his sixth count-that Penn Ship represented in the Trust Indenture that it would record the Navy's security instruments-was publicly disclosed when the Indenture was produced in response to a FOIA request made by Schorsch. *See Mistick,* 186 F.3d at 383; Relator's Memo. at 40; Reply at 5. Moreover, plaintiff is not an original source of this information because he learned of it as a consequence of that public disclosure, thereby rendering his knowledge of it non-independent. *See Stinson,* 944 F.2d at 1160. Instead, Atkinson devotes a significant percentage of his brief to arguments in support of a proposition that is not directly relevant in the context of this claim, viz., that Penn Ship's non-recording was not publicly disclosed. However, his pleadings focus to a far lesser extent on what is at issue in this count, namely Penn Ship's alleged intention not to record the Navy's security instruments. Viewed liberally, plaintiff's complaint features three allegations that bear on the question of Penn Ship's intent regarding the perfection of these security interests. Ironically, none of these assertions focus on the behavior of Penn Ship, but instead are comprised of inferences drawn by relator from actions allegedly taken by Fideli-

45. This Y element differs in a significant way from Penn Ship's alleged act in furtherance of the conspiracy addressed in relator's first count. Atkinson alleges that Penn Ship participated in that conspiracy by not recording the security instruments. In count six, he posits that Penn Ship had *no intention* of recording those instruments at the time of its promise to record them. Indeed, this allegation is essential to render Penn Ship's representation that it would record the Navy's security instruments fraudulent, as opposed to merely unfulfilled. *See Atkinson,* 2000 WL 1207162, at *18 ("The falsity of Penn Ship's statement regarding its promise to perfect the Navy's security interest turns on whether Penn Ship intended to carry out this promise at the time it was made." (citing *United States ex rel. Lamers v. City of Green Bay,* 998 F.Supp. 971, 987 (E.D.Wis.1998))).

ty. Specifically, relator's conclusion that Penn Ship lacked any intention of recording the security instruments is based on: 1) Fidelity's efforts to convince the Navy to accept the Trust Indenture without the delivery provision; 2) its failure to ensure the recording of the security instruments; and 3) its failure to sign the financing statements. *See* Complaint ¶¶ 70B–70J.

These, of course, also are the steps that relator claims were taken by Fidelity in furtherance of its conspiracy with Penn Ship to defeat the Trust Indenture. *See generally* Relator's Memo at 44. As such, the court undertook the public disclosure and original source analyses of these actions in evaluating the justiciability of plaintiff's first count. *See supra.* As I noted in the context of that discussion, defendants raised several arguments as to the applicability of § 3730(e)(4)(A) to these assertions, and against the proposition that relator is an original source of the information underlying them. *See* Def.'s Memo. at 24–27. Atkinson attempts in neither count one nor count six to demonstrate that Fidelity's alleged actions and omissions were not publicly disclosed, *see* Relator's Memo. at 44, and an independent review of the record confirms that defendants' allegations are well-founded. *See* App. at 715–16 (discussing the disclosure of the marked up version of the Trust Indenture during the course of the Senate Investigation);[46] *id.* at 500 (chronicling Schorsch's request for, and the Navy's disclosure of, the Trust Indenture, in which the perfection provision-from the existence of which plaintiff infers that Fidelity failed to ensure the recording of the security instruments, *see* Complaint ¶¶ 70C–70E–is contained);[47] *id.* at 318 (indicating that the UCC–1 financing statements were exhibits at the 1995 Senate hearings).

Atkinson similarly opts not to argue that he is an original source of any of this information, and again, while the record demonstrates the veracity of defendants' contrary assertions as to Fidelity's efforts to induce the Navy to omit the delivery provision and its failure to sign the financing statements, it undermines defendants' argument insofar as it concerns Fidelity's failure to ensure that Penn Ship recorded the Navy's security instruments. *See supra* (concluding that relator is an original source of this information because he learned it from Schorsch, who in turn learned it from an inspection of the Delaware County records). Plaintiff thus can be said to possess direct and independent knowledge of this one alleged omission on the part of Fidelity. Accordingly, al-

46. While the marked up version of the Trust Indenture obviously does not explicitly reveal that Fidelity convinced the Navy not to insist on the inclusion of the delivery provision, it is from this document that relator inferred such to have transpired. *See* Complaint ¶¶ 70F–70I. Under these circumstances, the public disclosure of the marked up Trust Indenture is sufficient to trigger § 3730(e)(4)(A). *See United States v. A.D. Roe Co., Inc.*, 186 F.3d 717, 724 (6th Cir. 1999) (stating that to "trigger § 3730(e)(4)(A), publicly disclosed documents ... need merely to disclose information which creates 'an inference of impropriety' " (quoting *United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 332 (6th Cir. 1998))).

47. Although plaintiff posits that the non-inclusion of this provision in the Trust Indenture evidenced Fidelity's failure to ensure the recordation of the Navy's security instruments, he also asserts that he *first* learned this fact through Schorsch's earlier inspection of the Delaware County records. Assuming this scenario to be true, this particular omission on Fidelity's part would fall within the public disclosure bar, as, under *Mistick,* relator's assertion of such in this action would be "based on" that public disclosure, but Atkinson would enjoy original source status with respect thereto, as his knowledge of this omission would be direct and independent.

though both the X and Y elements of Atkinson's sixth count have been publicly disclosed, plaintiff is an original source of the Y element insofar as it is inferred from Fidelity's failure to ensure that the security instruments were recorded.

Several of the courts of appeals have addressed the application of the original source exception in cases in which the relator is properly considered an original source of some, but not all, of the essential elements of a particular *qui tam* claim. However, these tribunals have failed to reach a consensus as to the proper interpretation of § 3730(e)(4)(B) under these circumstances. In *Springfield Terminal,* the D.C. Circuit took the position that, "in light of the aims of the [FCA], ... 'direct and independent knowledge of information on which the allegations are based' refers to direct and independent knowledge of *any* essential element of the underlying fraud transaction (*e.g.,* Y)." 14 F.3d at 657 (emphasis original). Under this formulation, of course, Atkinson's sixth claim would be rendered justiciable by the original source exception.

However, this reading of the original source provision has proved to be the jurisprudential exception, not the rule. Indeed, it appears to conflict with the plain language of § 3730(e)(4)(B), which states: "'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based...." As has been insightfully noted by another district court, "[t]he statute does not provide that all that is necessary is that the relator have 'direct and independent knowledge of *some of* the information on which the allegations are based.' ... [T]here is no indication in the language of the statute that the supporting information need only provide a fraction of the necessary elements of the allegation." *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.,* 9 F.Supp.2d 1273, 1277 (D.Kan.1998). Indeed, to grant original source status to a party in Atkinson's position would be to permit the prosecution of a *qui tam* claim by a party who, but for his examination of publicly-disclosed documents, would not have known that such a claim even was possible. Such a result would be contrary to the FCA's goal of "encourag[ing] persons with first-hand knowledge of fraudulent misconduct to report fraud." *Stinson,* 944 F.2d at 1154.

Accordingly, our Court of Appeals has indicated its inclination to abide by the majority view that a *qui tam* relator may not avail himself of the original source exception unless he has direct and independent knowledge of each essential element of his claim. *See Mistick,* 186 F.3d at 388 ("Mistick is not an 'original source' because it did not have 'direct and independent knowledge' of the most critical element of its claims ...."); *see also United States ex rel. Waris v. Staff Builders, Inc.,* 1999 WL 788766, at *8 (E.D.Pa. Oct. 4, 1999) (holding that where the plaintiff lacked independent knowledge of a critical element of his claim, he could not be considered an original source of the information contained in that claim).[48] Thus, plaintiff's sixth claim is not rendered justiciable under § 3730(e)(4)(B) because he

48. Although the *Stinson* court held that "it is not necessary for a relator to have all the relevant information in order to qualify as 'independent,'" 944 F.2d at 1160, the unambiguous language employed by the *Mistick* court indicates that a relator who lacks direct and independent knowledge of any *essential* element of a claim will not be considered an original source insofar as that claim is concerned. In this case, it is beyond dispute that the X element is an essential component of relator's sixth claim. Indeed, it is a logical necessity that in the absence of its underlying promise to record the security instruments, Penn Ship could not have made the knowingly false promise that it would record those instruments.

does not have direct and independent knowledge of all of its critical elements. This claim consequently will be dismissed pursuant to Fed.R.Civ.P. 12(b)(1).[49]

*Counts Eight and Nine* [50]

As articulated in plaintiff's second amended complaint, these nearly identical counts related to Penn Ship's allegedly fraudulent inducement of the Navy's exercise of its options for a third and fourth Oiler.[51] In particular, Atkinson averred that the exercise of both of these options-which transpired through Mods. 1 and 3 to the Oiler contract respectively-was predicated on Penn Ship's false representation that the terms of its BAFO were being presented in good faith, and did not constitute a deliberate underbid. *See Atkinson,* 2000 WL 1207162, at *20 ("[P]laintiff contends [in counts 8 and 9] that in signing these modification documents on behalf of Penn Ship [i.e., Mods. 1 and 3], Penn Ship's President, Ronald Stevens, confirmed that the terms of the Best and Final Offer were bona fide when, in fact, the terms of the Best and Final Offer were not."). However, in response to defendants' instant motion to dismiss these counts for lack of subject matter jurisdiction, Atkinson has alleged that, although still nearly identical, "[e]ach of these Counts, by virtue of Third Am. Comp. ¶ 103, also incorporates by reference the other allegations of the complaint, including that the trust indenture fraud induced ... these specific modifications." Relator's Memo. at 46. In effect, then, plaintiff seeks to substantively transform his eighth and ninth counts from allegations regarding the BAFO into claims concerning the Trust Indenture.

However, this effort is both impermissible and logically incoherent. It is imper-

**49.** For the sake of clarity, it is worthwhile to explain with particularity why relator's first count falls within the court's subject matter jurisdiction, while the same cannot be said regarding his sixth count. To reiterate, the surviving components of Atkinson's conspiracy claim are Penn Ship's failure to record the Navy's security instruments, and Fidelity's failure to ensure that Penn Ship recorded these instruments. Though both of these propositions were revealed in a public disclosure, relator is an original source of each because he learned of them from Schorsch's perusal of the Delaware County records, which do not constitute public disclosures under § 3730(e)(4)(A).

By contrast, the X element of plaintiff's sixth count is that Penn Ship stated that it would record the security instruments, and the Y element of this count is that, at the time it made this representation, Penn Ship did not intend to record those instruments. Although Atkinson infers the Y element from his inspection of the Delaware County records, he learned of the underlying promise to record the security instruments, i.e., the X element, though an inspection of the Trust Indenture itself, in which that obligation was memorialized. Relator came into possession of the Indenture as a consequence of its release pursuant to Schorsch's FOIA request, which is a public disclosure, *see Mistick,* 186 F.3d at 383, and thus his knowledge of the information contained therein is not "independent" as that term is used in § 3730(e)(4)(B). *Stinson,* 944 F.2d at 1160. Accordingly, he is not an original source of the X element of his sixth claim.

In the simplest of all possible terms, each element of relator's first and sixth count was publicly disclosed. Although he is an original source of both components of his first count, plaintiff enjoys such status with respect to one of the two essential elements of his sixth count. Under the jurisprudence delineated above, this is a distinction that renders the first count justiciable, but precludes the court from exercising jurisdiction over the sixth.

**50.** As indicated, *supra,* relator has elected not to amend the seventh count of his second amended complaint.

**51.** As discussed in *Atkinson,* count 8 pertained to the inducement of the third Oiler (the first "option" Oiler), and count 9 pertained to the fourth or second "option" Oiler. *See* 2000 WL 1207162, at *20.

missible because defendants' previous motion to dismiss the eighth and ninth counts of Atkinson's second amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) was unsuccessful. *See* 2000 WL 1207162, at *20. As such, I did not grant plaintiff leave to amend either of these counts, *see id.* at *23, and he accordingly was not permitted to undertake a dramatic substantive alteration of them. Moreover, relator's effort is illogical because the Trust Indenture fraud already is the subject of count six, wherein he asserts that this fraud resulted in the payment or approval of false claims "includ[ing] but not limited to the award of the Oiler Contract *and all modifications of it,* and all payments thereon and releases of Penn Ship's liabilities thereunder." Complaint ¶ 109 (emphasis added). Count six, then, already features the allegation that the Trust Indenture fraud was responsible for Mods. 1 and 3. Thus, if the essence of counts eight and nine is that "the trust indenture fraud induced subsequent modifications of the contract, including [Mods. 1 and 3]," as relator now asserts, then these counts are merely superfluous. Indeed, the only way in which either count eight or count nine will entail any independent significance is if it concerns a fraudulent allegation or transaction that has not been addressed by any of plaintiff's previous counts.[52]

While their illogical character is not a valid reason for the court to decline to accept Atkinson's characterization of his eighth and ninth counts,[53] the fact that such would constitute a non-permissive amendment to his second amended complaint is legitimate in this regard. *See* Fed.R.Civ.P. 15(a) (providing for only one amendment as a matter of right prior to the service of a responsive pleading). Thus, I will consider plaintiff's eighth and ninth claims as they appeared in that pleading. The elements of these claims are both straightforward and, to reiterate, identical, except insofar as count 8 relates to the allegedly fraudulent inducement of Mod. 1 and count 9 concerns Mod. 3. The X element, or misrepresented state of facts, is Penn Ship's assertion-implicit in the making of its BAFO-that the terms of that bid were bona fide. The Y element, or true state of facts, is that in making its BAFO, Penn Ship knowingly understated its projected costs. *See generally Atkinson,* 2000 WL 1207162, at *20.

Preliminarily, as stated in the context of plaintiff's fourth count, the X element of counts eight and nine, i.e., Penn Ship's BAFO itself, was publicly disclosed. *See supra;* Def.'s Memo. at 33–34. Moreover, relator is not an original source of this information, as it appears that he and Schorsch learned of it through the DoD IG's March 24, 1994 Audit Report, which had been publicly disclosed. *See* App. at 41 (Schorsch testifying that he learned of the target price included in Penn Ship's BAFO from the Audit Report). This public disclosure, of course, renders the knowledge that relator gleaned from the report non-independent. *See Stinson,* 944 F.2d at 1160.

As for the Y element of these counts, there are two allegations in relator's complaint that bear on the issue of whether Penn Ship's BAFO was genuine. One concerns the knowing exclusion of the costs

52. Upon reading the plain language of these counts, it becomes apparent that such is precisely the case. Put differently, the wording of counts eight and nine provides no indication that they in any way concern the Trust Indenture. It is only Atkinson's post hoc characterization of them that infuses the Trust Indenture fraud into counts eight and nine.

53. I note that were this not so, i.e., were I to construe plaintiff's eighth and ninth counts as a mere reiteration of his sixth count, these would be dismissed pursuant to Fed.R.Civ.P. 12(b)(1) for precisely the same reasons as were delineated in the court's discussion of count six.

associated with the creation of architectural drawings and the delay that the preparation of such schematics would occasion, *see* Complaint ¶ 107, and the other sounds in the Trust Indenture fraud insofar as that fraud reveals that Penn Ship anticipated defaulting on the Oiler contract.[54] *See* Relator's Memo. at 46 n. 32. As indicated in the court's discussions of relator's fourth and sixth counts respectively, the allegations that Penn Ship deliberately understated the cost of completing the Oilers and that it intended to defeat the Navy's security interests under the Trust Indenture-from which Atkinson infers "an undisclosed likelihood of non-performance," *id.*-both were publicly disclosed prior to being made in this litigation. *See supra.* Furthermore, although Atkinson is an original source of the information from which he infers Penn Ship's intent not to record the Navy's security instruments,[55] *see supra*, he derived his knowledge of its alleged understatement of its projected costs from the DoD IG's pre-award survey, which was made publicly available at the 1995 Senate hearings. *See* App. at 203. This knowledge, then, is not independent under *Stinson. See* 944 F.2d at 1160.

Thus, both the X and Y elements of plaintiff's eighth and ninth counts were publicly disclosed through one of the means listed in § 3730(e)(4)(A), and Atkinson is an original source of only the Y element insofar as it is based on Penn Ship's alleged intent not to record the Navy's security instruments. This was precisely the situation presented in the context of relator's sixth count, and the reasoning set forth in the portion of this memorandum that addresses that count applies with equal force in the present context.[56] Accordingly, relator's eighth and ninth counts will be dismissed pursuant to Fed.R.Civ.P. 12(b)(1).

*Counts Ten and Eleven* [57]

These counts feature allegations

54. This allegation, though rooted in the alleged Trust Indenture fraud, differs significantly from plaintiff's attempt to transform his eighth and ninth counts into replicas of his sixth. Whereas the non-permissive amendment of these counts would have altered their substance, this allegation, while also based on the alleged Trust Indenture fraud, bears directly on counts eight and nine as they appeared in the second amended complaint. That is, instead of changing the operative allegation from one concerning the genuineness of the BAFO to one concerning Penn Ship's efforts to defeat the Trust Indenture, this assertion posits that the BAFO was not genuine as evidenced by Penn Ship's efforts to defeat the Trust Indenture.

Defendants take issue with the very premise underlying this contention. They state: "It is hard to imagine how ... Atkinson can infer from the alleged 'trust indenture fraud' that the BAFO was fraudulent. As Atkinson knows, Penn Ship's BAFO was prepared in the fall of 1984 and submitted in December 1984, while the Trust Indenture was not submitted to the Navy until March 15, 1985." Reply at 15. Although defendants may be correct in so positing, I find it unnecessary to address this contention because relator's eight and ninth counts are not justiciable even as he has formulated them.

55. As noted, this is so only to the extent that relator infers this intent from Fidelity's failure to ensure that the Navy's security instruments were recorded.

56. Indeed, the X element of Atkinson's eighth and ninth counts is no less "essential" than was the X element of count six. Just as relator could not have viably alleged that Penn Ship made a knowingly false promise to record the Navy's security instruments without first learning that the Trust Indenture provided for such recordation, it would be impossible for plaintiff to allege that the BAFO constituted a knowing understatement of Penn Ship's anticipated costs had he not become aware of the terms of the BAFO in the first place.

57. Fidelity argues that these counts "are [d]efective and [u]ntimely and must be [d]ismissed." Fidelity's Motion to Dismiss at 31. However, given the court's conclusion that

of false claims and reverse false claims [58] in connection with Mods. 5 and 11 [59] to the Oiler contract, and like their two immediate predecessors, they are nearly identical. According to Atkinson, Penn Ship's President, Ronald J. Stevens, made two implicit representations in signing these modification agreements, neither of which was accurate or advanced in good faith, and both of which resulted in significant pecuniary harm to the Navy. These are 1) that Penn Ship was entering into Mods. 5 and 11 with the intent to perform under their terms; and 2) that Penn Ship had perfected the Navy's security interests under the Trust Indenture. *See* Complaint ¶¶ 113, 113A, 114, 114A. Atkinson avers that the Navy would not have entered into Mods. 5 and 11 in the absence of these representations. *See id.* Yet in reality, plaintiff posits, Penn Ship had no intention of performing under these modifications, and had not recorded the Navy's security interests. *See id.* ¶¶ 113, 114. Relator further avers that the Navy's acceptance of Mods. 5 and 11 also was dependent on Fidelity's breach of its fiduciary duty to the Navy, because had Fidelity fulfilled that duty by advising the Navy of the non-perfection of its security interests, the Navy would not have agreed to these modifications. As such, he contends, Fidelity caused Mods. 5 and 11 "to be used to avoid and decrease Penn Ship's obligation to pay or transmit money or property to the Navy." *Id.* ¶¶ 113D, 114D.

Atkinson alleges that Penn Ship's intent not to perform under Mods. 5 and 11 is evidenced by its failure to record the Navy's security instruments. *See id.* ¶¶ 113F, 114F ("[T]he failure to perfect the ... security interests, with consequent injury to the Navy and benefit to Penn Ship in the event of default, evidences that Penn Ship and Fidelity foresaw a likelihood of a Penn Ship default on the Oiler Contract inconsistent with what Penn Ship impliedly represented ... to the Navy...."). Naturally, he contends that the falsity of Penn Ship's implicit representations concerning the recording of the security instruments is likewise demonstrated by the fact of their non-recordation. Moreover, plaintiff alleges that as indicated in the context of his first count, Fidelity's breach of fiduciary duty was manifested in its efforts to convince the Navy not to insist on the delivery provision, its failure to ensure that the security interests were recorded, and its failure to sign the UCC-1 financing statements. *See supra.*

Given that these counts actually focus on three distinct fraudulent transactions, they must be presented trichotomously:

A) Penn Ship's representation that it would perform under Mods. 5 and 11:

X Penn Ship implicitly represents that it will perform, as embodied

the public disclosure bar precludes the justiciability of these counts, the court need not address this contention.

58. As opposed to garden variety false claims, which involve knowingly fraudulent demands for payment from the government, "reverse false claims" involve the knowing use of a false "record or statement to conceal, avoid, or decrease an obligation to the United States.'" *Atkinson,* 2000 WL 1207162, at *7 (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co.,* 721 F.Supp. 1247, 1259 (S.D.Fla.1989)). Reverse false claims are actionable under 31 U.S.C. § 3729(a)(7).

59. As indicated above, as consequence of Mod. 5, the two option Oilers were deleted from the contract and the contract was changed from a cost reimbursement incentive price contract to a fixed price agreement. *See* Complaint ¶¶ 80–81. Mod. 11 provided for an advance payment of up to $17,000,000 from the Navy to Penn Ship which was to be secured by the floating drydock. *See id.* ¶ 83.

in its very agreement to Mods. 5 and 11.

Y Penn Ship has no intention of performing, but rather anticipates defaulting on its Oiler contract obligations, as evidenced by its failure to record the Navy's security instruments (which was discerned by Schorsch through the examination of the Delaware County records).[60]

B) Penn Ship's representation that it had perfected the Navy's security interests under the Trust Indenture:

X Penn Ship implicitly represents that it has perfected these security interests, as embodied in its very agreement to Mods. 5 and 11.

Y Penn Ship did not record the security instruments, as disclosed by Schorsch's examination of the Delaware County records.

C) Fidelity's breach of its fiduciary duty to the Navy:

X Fidelity, by agreeing to serve as trustee under the Trust Indenture, promises to serve as a fiduciary of the Navy.

Y Fidelity breaches this duty by convincing the Navy not to insist on the delivery provision, by failing to ensure that the security instruments were recorded, and by failing to sign the UCC–1 financing statements, thereby causing the Navy to agree to Mods. 5 and 11.

I will begin by addressing transactions A and B together, as the sources of their respective components are identical. Defendants contend that the X elements of these transactions-both of which are implicit in Penn Ship's agreement to Mods. 5 and 11–were publicly disclosed on several occasions. *See* Def.'s Memo. at 44. Indeed, the terms of both of these modification agreements were delineated in detail in the March 25, 1994 DoD Audit Report. *See* App. 276, 295. Under *Mistick,* this suffices to invoke § 3730(e)(4)(A)'s jurisdictional bar. *See* 186 F.3d at 388. Defendant does not contest this point, nor does he assert that he is an original source of this information. *See* Relator's Memo. at 47. Instead he argues that the Y element of these assertions, viz., the non-recording of the Navy's security instruments, was not publicly disclosed. *See id.*

As discussed in the context of Atkinson's first count, this assertion is incorrect. In fact, Penn Ship's non-recording was publicly disclosed both in the Navy's October 12, 1993 response to Schorsch's FOIA request and again in the DoD IG's March 24, 1994 Audit Report. *See* App. at 509, 273. Yet as further indicated in the context of that count, relator is an original source of that information. *See supra* (rejecting defendants' arguments against this proposition). Accordingly, the situation with which the court is confronted with respect to assertions A and B-as they are labeled above-is that the X and Y elements of both assertions were publicly disclosed, and while relator is an original source of the Y elements of these assertions, he is not an original source of their X elements. Under these circumstances, plaintiffs' tenth

60. In *Atkinson,* I held that the Penn Ship's intent not to fulfill its promise to record the Navy's security instruments could not be demonstrated through a mere showing that those interests were not recorded. *See* 2000 WL 1207162, at *18–19. While allegation A is distinguishable from that contention, as it concerns Penn Ship's intention to perform as per the terms of Mods. 5 and 11 as opposed to its intent to perform as per the Trust Indenture, I express no opinion as to whether allegation A constitutes a viable claim under § 3729(a)(2) or § 3729(a)(7). Nor do I reach this issue below, given the court's conclusion that counts ten and eleven are barred in their entireties by § 3730(e)(4)(A).

and eleventh counts, insofar as they concern assertions A and B, are non-justiciable. To reiterate, where all of the essential elements of a *qui tam* claim have been publicly disclosed, the relator must be an original source of *each* of these elements if the public disclosure bar is to be surmounted pursuant to § 3730(e)(4)(B). *See Mistick,* 186 F.3d at 388–89 (holding that the relator was not an original source of a particular fraud claim where he was not an original source of the misrepresented state of facts). Because this requirement is unsatisfied with respect to transactions A and B, relator's tenth and eleventh claims are non-justiciable insofar as they are predicated on these particular transactions.

Both essential elements of transaction C also were publicly disclosed within the meaning of § 3730(e)(4)(A). The X element, i.e., that Fidelity promised to serve as the Navy's fiduciary, was revealed when the Trust Indenture was produced in response to a FOIA request made by Schorsch. *See* App. at 500. As for the Y element, plaintiff previously has conceded that each of Fidelity's actions addressed by this element were disclosed through a means set forth in § 3730(e)(4)(A). *See* Relator's Memo. at 44 (addressing these actions as components of plaintiff's conspiracy count). He advances no contrary argument in the context of count ten or eleven.

Given that both the X and Y elements of transaction C were publicly disclosed, § 3730(e)(4)(A)'s jurisdictional bar will apply to counts ten and eleven-insofar as they are predicated on transaction C-unless relator is an original source of both of the essential elements of that transaction. *See Mistick,* 186 F.3d at 388–89. Yet Atkinson is not an original source of the X element of transaction C. Indeed, he cannot be an original source of the fact that Fidelity agreed to serve as trustee under the Trust Indenture because he learned of such by reading that agreement, which he obtained through Schorsch's FOIA request. *See* Relator's Memo. at 40 (acknowledging that the Trust Indenture and its contents were publicly disclosed, and not contesting defendants' assertion that his knowledge of those contents stems directly from that disclosure). Because his knowledge of this information was dependent on a public disclosure, that knowledge was not "independent," *see Stinson,* 944 F.2d at 1160, and he consequently cannot be deemed an original source of the X element of transaction C. *See* § 3730(e)(4)(B). Accordingly, relator cannot avail himself of the original source exception in the context of this assertion despite the fact that, as explained, *supra,* he is an original source of the Y element of this transaction, viz., that Fidelity failed to ensure that the Navy's security instruments were recorded. This is so for the now familiar reason that where a *qui tam* relator has direct and independent knowledge of some, but not all, of the essential elements of a particular claim, he falls outside the scope of § 3730(e)(4)(B).

In sum, then, each element of the allegations addressed in counts ten and eleven of Atkinson's complaint was publicly disclosed, and plaintiff cannot be considered an original source of both of the essential elements underlying any of these allegations. As such, the court is without jurisdiction over these counts, *see* § 3730(e)(4)(A), and they will be dismissed pursuant to Fed.R.Civ.P. 12(b)(1).

*Count Twelve*

Atkinson's twelfth count focuses on the default Mod., and alleges violations of §§ 3729(a)(2) and (7) stemming from Penn Ship's inducement of the Navy's assent thereto. To reiterate, this modification to the Oiler contract held Penn Ship in default, provided for the transfer of the

two original Oilers to another shipyard, terminated the Trust Indenture, made Penn Ship liable for reprocurement and other costs and, ultimately, released it from further liability under the contract. *See* Complaint ¶ 85. Additionally, the Navy received an increase of two million dollars in its secured interest in the floating drydock,[61] *see id.* ¶ 86, a subordinated mortgage on some of the land and buildings comprising the Chester Yard, and a preferred ship mortgage on the massive Sun 800 floating derrick. *See id.* ¶ 88. These mortgages, relator asserts, were "to secure Penn Ship's obligations to sell the collateral-the land and buildings, and the Sun 800 derrick-during a thirteen month period, and apply a portion of the proceeds of such a sale to pay a portion of the Navy's reprocurement costs occasioned by Penn Ship's default." *Id.* Plaintiff further states that "[u]nder the applicable terms, however, if Penn Ship could not effect a sale within thirteen months, then the Navy would no longer be entitled to share in the proceeds of any subsequent sale." *Id.* In other words, if Penn Ship was unable to sell the collateral during the thirteen month period, then it no longer would be obligated to even attempt to do so, and the Navy's interest in the land, buildings and derrick would vanish.

The gravamen of relator's twelfth count is that in agreeing to the terms of the default Mod., Penn Ship falsely represented that it intended to fulfill its obligation to attempt to sell the land, buildings and derrick. The fallaciousness of this representation, Atkinson posits, is evidenced by the fact that during the thirteen month window period Penn Ship caused the formation of MCC, to which it sold the Sun 800 shortly after this window had closed, and which in turn sold the derrick to Donjon. Accordingly, the essential elements of this count are as follows:

X As per the default Mod., Penn Ship asserts that it will use its best efforts to liquidate its interest in the land, buildings and derrick within the thirteen month period.

Y At the time it made this assertion, Penn Ship had no intention of selling any of these assets, as evidenced by the fact that immediately after the expiration of the 13 months, it sold the derrick to MCC (the creation of which it had caused during the 13 month period), which in turn sold it to Donjon.

Defendants contend that the terms of the default Mod., and specifically the temporal limitations on Penn Ship's obligation to attempt to sell-and on the Navy's interest in-these collateral instruments, were publicly disclosed on several occasions prior to forming the basis for claims advanced by Atkinson. *See* Def.'s Memo. at 48. They also assert that the various components of the Y element of count twelve were revealed publicly, *see id.* at 48–49, and that plaintiff is not an original source of the information underlying the allegations contained in this count. *See id.* at 49.

Relator raises two arguments against the applicability of the public disclosure bar to his twelfth count. First, he posits that the allegations comprising this count were advanced in his amended complaint in the predecessor action, and that therefore any subsequent public disclosures are irrelevant to the count's justiciability. *See* Relator's Memo. at 47. Second, he contends that this count has as an alternative basis the Trust Indenture fraud; that is, he asserts that because the Trust Indenture fraud was not publicly disclosed, and

61. This interest, which was increased pursuant to the default Mod. from $17,000,000 to $19,000,000, was received initially from Penn Ship as per the terms of Mod. 11.

because the Navy's agreement to the default Mod. was a consequence of that fraud, count 12 is not subject to dismissal pursuant to § 3730(e)(4)(A). *See id.* at 48. "Accordingly," plaintiff asserts, "it is of no moment whether public disclosures support the alternative basis alleged, that is that Penn Ship contemporaneously lacked the intention to timely perform its obligations to dispose of collateral under the [d]efault Mod." *Id.*

Both of the arguments raised by Atkinson must be rejected. As for the first, the public disclosure bar will render non-jurisdictional any *qui tam* claim the essential elements of which were revealed in a public disclosure-as that term is defined in § 3730(e)(4)(A)-prior to the allegation's assertion in the present action. *See Mistick,* 186 F.3d at 388. As was indicated in the context of relator's first count, the question of whether a presently-advanced allegation also was raised by relator in a previous litigation is wholly irrelevant to the determination of whether the essential elements of that allegation were revealed through a source listed in § 3730(e)(4)(A) prior to being raised in the present action.[62]

Atkinson's second contention is likewise unavailing. Like the other claims in plaintiff's second amended complaint that withstood defendants' challenge pursuant to Fed.R.Civ.P. 12(b)(6), Atkinson's twelfth count was not one that he was granted leave to amend. *See Atkinson,* 2000 WL 1207162, at *23. Accordingly, just as relator was not free to undertake dramatic, substantive revisions of his fourth, eighth and ninth counts, the modification of count twelve from one concerning Penn Ship's alleged intent not to sell the Navy's collateral under the default Mod. into a claim regarding Trust Indenture fraud constitutes a non-permissive amendment to his second amended complaint.[63] *See* Fed. R.Civ.P. 15(a) (permitting the amendment of a pleading "as a matter of course" only once prior to the service of a responsive pleading). As such, the version of this count that legitimately is before the court focuses on the creation of MCC and the subsequent sale of the derrick to MCC as indicia of Penn Ship's intent not to adhere to the terms of the default Mod.

The X element of the twelfth count was publicly disclosed in both the 1994 DoD Audit Report and the 1995 Senate hearings.[64] *See* App. at 277, 282, 344–45. Indeed, both of these sources delineated the conditions under which Penn Ship would be liable to the Navy for additional reprocurement costs, i.e., were it able to liquidate the collateral during the thirteen month period. Moreover, the fact and terms "best efforts" provision were expressly detailed in the DoD Audit Report. *See id.* at 282. Similarly, the Y element (the sale of the derrick to MCC and the subsequent sale to Donjon) was publicly disclosed in a Coast Guard abstract of title,

62. As also was indicated in the court's discussion of Atkinson's first count, this factor may be relevant to the original source analysis. *See supra.*

63. Moreover, even if I could consider relator's Trust Indenture fraud theory in the context of this count, the justiciability of this claim necessarily was addressed in the context of count six, wherein plaintiff asserted that the Trust Indenture fraud was responsible for all subsequent modifications of the Oiler contract. The court's conclusion that the public disclosure bar prevents the exercise of jurisdiction over that count thus negates any potential viability of relator's Trust Indenture theory as a basis for count twelve.

64. Although these hearings transpired after the inception of the instant action, they antedated relator's assertion in the instant litigation of a count based on the default Mod. and, in particular, Penn Ship's intent to perform pursuant thereto. Such a claim was first raised in January, 1999, in plaintiff's second amended complaint.

which itself constitutes an "administrative report" within the meaning of § 3730(e)(4)(A), *see supra*, and which was an exhibit at the 1995 Senate hearings. *See App.* at 374–75, 683–84.

Accordingly, the FCA's public disclosure provision will bar plaintiff's twelfth count unless he is an original source of the information underlying its allegations. Atkinson testified that he learned of the terms of the default Mod. from Schorsch. *See* App. at 224. Schorsch, in turn, derived this information from Arthur Hainer, Senior Auditor on the DoD's audit team. *See* App. at 111–113. While Atkinson can be considered an original source of information unearthed by his co-relator during the course of a joint investigation, *see supra*, this principle holds true only if Schorsch himself could be considered an original source. Yet here, because Schorsch learned of the terms of the default Mod. from Hainer, who unquestionably is an "intervening agen[t]," *see Stinson*, 944 F.2d at 1160, his knowledge of such cannot be deemed direct. Consequently, neither he nor Atkinson is an original source of the terms of the X element of count twelve.

Atkinson learned of the sale of the derrick to MCC, and its subsequent sale to Donjon, from Schorsch. *See* App. at 227–30. Schorsch, in turn, had heard a rumor that the derrick had been sold, and requested the Coast Guard abstract of title to confirm this, which the abstract ultimately did. *See id.* at 114–17.[65] Thus, Schorsch discerned that the derrick had been sold and resold by examining a public disclosure, and as such his knowledge was not independent. *See Stinson*, 944 F.2d at 1160. Therefore, he cannot be considered an original source of this information, *see* § 3730(e)(4)(A), and thus neither can Atkinson. For these reasons, the court is without jurisdiction over relator's twelfth count, and I will dismiss this count pursuant to Fed.R.Civ.P. 12(b)(1).

*Relator's Additional Count* [66]

This count, brought pursuant to 31 U.S.C. §§ 3729(a)(1) and (2), focuses on the biweekly progress payments made by the Navy to Penn Ship subsequent to October 27, 1986.[67] Atkinson posits that "[q]uite apart from any fraud in the procurement of the Oiler Contract or its modifications, many of the[ ] vouchers or invoices [submitted by Penn Ship to the Navy] were false or fraudulent in that they overstated Penn Ship's costs to date and, on that basis, claimed an entitlement to payment in excess of what Penn Ship would actually have been entitled to even under the unusually generous contract terms." Complaint ¶ 99. Specifically, he asserts, "Penn Ship overstated its costs in including among them supposed employee payroll deductions which, in fact, had not been applied for the benefit of the employees and, also, payments to subcontractors which had, in fact, not yet been made." [68]

**65.** The abstract details both the sale to MCC and the ensuing sale to Donjon. *See* App. at 683–84.

**66.** While the second amended complaint in this action contained a thirteenth and fourteenth count, relator has opted to drop rather than amend these counts in his third amended complaint.

**67.** Although relator does not impose this temporal limitation on his claim, it nonetheless exists because, as discussed previously, the pre-amendment version of the public disclosure bar applies to relator's complaint insofar as it is based on claims submitted by Penn Ship prior to October 27, 1986. *See supra.* That version of the bar would render nonjusticiable all of relator's claims, and as such, the court is without jurisdiction over those to which it does apply.

**68.** Plaintiff asserts that "[t]he terms of the Oiler Contract ... were highly unusual in allowing progress payments in excess of the percentage of work actually completed." Complaint ¶ 98.

*Id.* The essential elements of the additional count, then, are as follows:

X Penn Ship submits biweekly invoices to the Navy, in which it represents that it has made certain expenditures to date.[69]

Y Penn Ship did not actually spend the monies for which it sought compensation.

Defendants assert that both of these allegations were publicly disclosed, and that Atkinson is an original source of none of the information on which they are based. *See* Def.'s Memo. at 50–51. Plaintiff counters that "[b]ecause the trust indenture fraud induced the contract and modifications, the public disclosure bar does not apply to these claims." Relator's Memo. at 48. Yet Atkinson never was granted leave to add any additional count to his complaint, and moreover, this assertion also was made in the context of count six, in which relator contends that the Trust Indenture fraud resulted in the payment of the claims at issue in this additional count. *See* Complaint ¶ 109 (asserting that the Trust Indenture fraud resulted in "the award of the Oiler Contract ... and all payments thereon"). Accordingly, I will evaluate this count as being comprised of the elements delineated above.

Both the X and Y elements of this count were publicly disclosed in the 1994 DoD Audit Report. That report states:

> The [DoD Inspector General's] investigation addressed allegations that Penn Ship progress payment submissions included incurred costs for employee payroll deductions, which Penn Ship did not remit to the appropriate organizations in a timely manner. Penn Ship withheld the deductions beyond the normal 45–day billing cycle before making payment. Penn Ship also withheld payments to vendors while the Navy continued to make progress payments based on incurred costs.

App. at 263. This report thus set forth both the fact of Penn Ship's progress payments and the allegations made by Atkinson regarding their fraudulent nature. Moreover, in response to a set of interrogatories posed by Penn Ship, relator stated that the information underlying his additional count was derived from the DoD Audit Report. *See* App. at 501.[70] As such, his knowledge of the information underlying this count is neither independent, *see Stinson,* 944 F.2d at 1160, nor direct, *see id.,* and relator consequently is not an original source of such under § 3730(e)(4)(B). This count accordingly will be dismissed pursuant to Fed.R.Civ.P. 12(b)(1).

*Summary of Conclusions Regarding Defendants' Arguments Regarding Dismissal Pursuant to Fed.R.Civ.P. 12(b)(1)*

With the exception of count one, each count of relator's third amended complaint is rendered non-justiciable by the public disclosure bar codified at 31 U.S.C. § 3730(e)(4)(A). This is so because each essential element of the transactions or allegations on which these counts are based was disclosed through one or more of the means listed in that section. More-

69. Notably, this count concerns Penn Ship's alleged practice of submitting false invoices to the Navy, not any specific submissions of this sort.

70. Plaintiff posits that he and Atkinson actually are "original sources" of this report, as they "gave information leading to the investigation the results of which appear in the report." App. at 501. Yet this is irrelevant to the question of whether they are original sources of the information contained in the report. The fact is that, by Atkinson's own admission, neither he nor Schorsch knew of the fraudulent invoices or vouchers allegedly submitted by Penn Ship. He states that he did not know of this specific information until the DoD Inspector General presented it to him. As such, he cannot qualify as an original source under § 3730(e)(4)(B).

over, Atkinson does not possess direct and independent knowledge of all of the elements of any of these allegations or transactions. Accordingly, he cannot avail himself of the original source exception codified at 31 U.S.C. § 3730(e)(4)(B).

However, as indicated *supra*, plaintiff's first count is justiciable in a modified form. Specifically, although each essential element of Atkinson's conspiracy claim has been publicly disclosed, relator can be considered an original source of his information regarding Penn Ship's failure to record the Navy's security instruments and Fidelity's failure to ensure the perfection of those security interests. This suffices as a cognizable conspiracy claim. *See Atkinson*, 2000 WL 1207162, at *7 (" 'The essence of a conspiracy under the [False Claims] Act is an agreement between two or more persons to commit a fraud.' " (quoting *Hill*, 676 F.Supp. at 1173)). Accordingly, defendants' motion to dismiss Atkinson's third amended complaint pursuant to Fed.R.Civ.P. 12(b)(1) will be denied as to relator's first count insofar as that count sounds in Penn Ship's non-recording and Fidelity's failure to ensure such recordation. Yet defendants also allege that the dismissal of plaintiff's conspiracy allegation is warranted pursuant to Fed. R.Civ.P. 12(b)(6). They raise several distinct arguments in support of this assertion, and it is to the persuasiveness of these arguments in the context of plaintiff's first-and only remaining-count that I now turn.

### B. *Defendants' Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6)*

#### 1. Legal Standard for Dismissal Pursuant to Federal Rule of Civil Procedure 12(b)(6)

The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of the complaint. *Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir.1993). Accordingly, the court "must accept as true all of the factual allegations in the complaint as well as the reasonable inferences that can be drawn from them." *Doe v. Delie*, 257 F.3d 309, 313 (3d Cir.2001) (citing *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir.1993)). After so doing, the court must deny the motion unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Doe*, 257 F.3d at 313 (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). This does not mean, however, that the court must accept as true "unsupported conclusions and unwarranted inferences." *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir.1997). Indeed, as indicated by our Court of Appeals, "courts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable. [They] do draw on the allegations of the complaint, but in a realistic, rather than a slavish, manner." *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263 (3d Cir.1998).

#### 2. Fidelity's Argument that it Lacked any Obligation to Ensure the Recording of the Navy's Security Instruments

Fidelity asserts that Atkinson's conspiracy allegation fails to state a viable claim because, taken at face value, it does not point to any wrongdoing on Fidelity's part. Specifically, Fidelity avers that under Pennsylvania law, which is deemed to govern all questions concerning the Trust Indenture, *see* Trust Indenture ¶ 12, its duties as trustee are to be ascertained primarily from the trust instrument. *See* Fidelity's 12(b)(6) Memo. at 27 (citing *In re Niessen's Estate*, 489 Pa. 135, 413 A.2d 1050, 1052–53 (1980)). It posits that the Indenture bestowed on it duties that were

"essential custodial" in nature. Fidelity's 12(b)(6) Memo. at 28. In particular, Fidelity alleges that it was obligated merely to "hold the [Navy's] [s]ecurity [i]nstruments and act only if Penn Ship owed money to the Navy, and only after [it] received written notice from the Navy enclosing a copy of its demand letter to Penn Ship." *Id.* Absent from this set of duties, it alleges, is any responsibility for ensuring that the security instruments were recorded.

Atkinson counters these contentions by pointing to a provision of the Trust Indenture that entitled Fidelity, at any time and at Penn Ship's expense, "to seek the advice of counsel on the actions necessary or advisable to perfect [its own] secured status under the [s]ecurity [i]nstruments or to maintain its perfected status." Trust Indenture ¶ 14. Moreover, and more fundamentally, he somewhat incredulously queries whether the Navy might possibly have agreed to an arrangement under which Fidelity "would have no duty whatsoever to protect the trust corpus, and might even take actions adverse to it." Relator's Memo. at 32.

I conclude that relator has the better of this argument, and further, that this conclusion is not dependent on any close parsing of the terms of the Trust Indenture. Fidelity is correct in positing that, as a tenet of Pennsylvania jurisprudence, the duties of given trustee are to be determined pursuant to trust instrument that bestows those obligations on him, as opposed to general fiduciary principles. Thus, for example, where a trust instrument relaxes the standard of care that must be demonstrated by a trustee, that provision will, under most circumstances, be afforded governing effect. *See In re Niessen's Estate,* 413 A.2d at 1052 n. 4 (citing Restatement (Second) of Trusts § 174 cmt. d (1959)); *Gouley v. Land Title Bank & Trust Co.,* 329 Pa. 465, 198 A. 7, 9 (1938) (holding that it is permissible for a settlor to exempt the trustee from liability except to the extent that the trustee is grossly negligent or engages in intentional misconduct). Moreover, although a trustee generally is imbued with the discretion to invest trust assets in ways that he reasonably believes will yield the maximum return for the beneficiaries, a settlor's express limitation on this discretion will be binding on the trustee. *See In re Saunder's Estate,* 393 Pa. 527, 530–31, 143 A.2d 367 (1958).

However, this legal maxim does nothing to alter the fact that there exist numerous underlying common law duties that a trustee must fulfill in favor of the trust's beneficiaries. Included among these is a "duty to protect trust assets from destruction." *In re Hamill's Estate,* 487 Pa. 592, 410 A.2d 770, 775 n. 7 (1980); *see also* Restatement (Second) of Trusts § 176 (delineating the trustee's duty to use reasonable care and skill to preserve the trust property). Indeed, although the settlor generally may expressly excuse the trustee's non-compliance with, or modify the trustee's duties with respect to, any or all of these obligations, the fact that a trust instrument modifies some aspect(s) of the trustee's duties does not negate other common law requirements that the settlor's mandate does not address. In other words, a given fiduciary obligation is not abrogated through the settlor's elimination or modification of a different fiduciary obligation. Moreover, even an express modification of a trustee's obligations will not be given effect when such would permit the trustee to act in bad faith. *See Gouley,* 198 A. at 9 (discussing "the well-settled principle that no exculpatory provision in a trust instrument can permit a trustee to act in bad faith") (citation omitted).

As applied to the instant facts, the Trust Indenture, by its terms, excused Fidelity from responsibility for recording the

Navy's security instruments, as it assigned that obligation to Penn Ship. *See* Trust Indenture ¶ 14. However, the Indenture contained no provision that modified Fidelity's fiduciary obligation to use reasonable care to protect the trust res, viz., the Navy's security instruments. Significantly, even to the extent that the Indenture did purport to do so, such a provision could not empower Fidelity to knowingly permit the Navy's security interests to be undermined. *See Gouley,* 198 A. at 9; Restatement (Second) of Trusts § 222(2) ("A provision in the trust instrument is not effective to relieve the trustee of liability for breach of trust committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiary...."). In this case, the Trust Indenture would have secured the Navy only upon the recording of the various security instruments. In the absence of such recordation, the Navy lacked any secured interest in the property to which the instruments pertained, and was deprived of the protection that would otherwise have been provided by the Indenture. Thus, the recordation of the security instruments was an indispensable means to the Navy's protection under the Indenture, and Fidelity consequently was obligated to ensure that such recordation transpired in order to fulfill its fiduciary duty to protect the trust res. Fidelity's argument that it lacked such an obligation consequently is unpersuasive, and dismissal pursuant to Fed. R.Civ.P. 12(b)(6) on this basis is unwarranted.

3. Fidelity's Argument that Nonfeasance Cannot form the Basis of a False Claims Act Claim

Fidelity also argues that plaintiff cannot state a viable FCA claim against it because its alleged wrongdoing consisted, in pertinent part, of *not* ensuring that the Navy's security interests were perfected. In support of its contention that the § 3729(a)(3) does not reach nonfeasance, Fidelity cites *United States ex rel. Piacentile v. Wolk,* and points specifically to the *Piacentile* court's holding that:

> [T]he government has alleged no actions on the part of defendant ... that constitute "presenting, or causing to be presented"[71] a false or fraudulent claim. Mere inaction is not enough to constitute a violation of the False Claims Act. The government's argument that defendant ... was aware of the fraud does not eliminate the need for some action by the defendant whereby the claim is presented or caused to be presented.

1995 WL 20833, at *4 (E.D.Pa. Jan. 17, 1995) (citing *United States v. Murphy,* 937 F.2d 1032, 1039 (6th Cir.1991)).

It is true that, viewed in the abstract, this language appears to buttress Fidelity's contention. As was aptly noted in Piacentile, if a person merely sits idly by and watches another commit fraud, this is an insufficient basis on which to ground FCA liability. In fact, such was precisely the situation with which that court was confronted. In arguing that liability could properly be imposed on the *Piacentile* defendant pursuant to § 3729(a)(1) and (2), the government had posited that the "'[d]efendant ... knew that ... certificates of medical necessity were being altered and that ... [Medicare claim forms] contained false information, but did not take action to ensure that the practice was discontinued.'" 1995 WL 20833, at *3. As such, the government had alleged merely that the defendant was aware of,

71. This language is derived from § 3729(a)(1), the provision that was at issue in *Piacentile.*

and did nothing to prevent, the submission of false claims by other persons, and the court undoubtedly was correct in holding that these allegations did "not eliminate the need for some action by the defendant whereby the claim [was] presented or caused to be presented." *See id.* at *4; 31 U.S.C. § 3729(a)(1) (predicating liability on the knowing presentation or causation of the presentation of a false or fraudulent claim).[72]

However, the problem for Fidelity is that taken in the abstract, this passage is a misleading statement of the law. When a party incurs a *duty* to prevent a fraud on the government, its failure to fulfill that duty can give rise to liability under the False Claims Act. *See Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732–33 (7th Cir.1997) (noting that where a party knowingly omits material information in presenting a "misleading half-truth" to the government,[73] that omission may give rise to FCA liability if the government relied thereon to its financial detriment); *United States ex rel. Berge v. Bd. of Trustees*, 104 F.3d 1453, 1461 (4th Cir. 1997) ("There can ... be liability under the False Claims Act where the defendant has an obligation to disclose omitted information.") (citation omitted); *United States v. Job Resources for Disabled*, 2000 WL 1222205, at *3 (noting that material[74] omissions, as well as "affirmative misstatements," can "trigger liability under the False Claims Act"); *see also generally United States ex rel. S. Prawer & Co. v. Verrill & Dana*, 962 F.Supp. 206, 208 n. 2 (D.Me.1997) (holding, in the context of a § 3729(a)(3) claim alleging that the defendants had conspired to conceal from the FDIC the "nonputability" of several promissory notes that had been "put" to the FDIC, that the allegations regarding the defendants' non-disclosure of the notes' "nonputability" through both affirmative acts and omissions stated a valid claim under § 3729(a)(3)). Indeed, an examination of the language of § 3729(a)(3) reveals *nothing that requires that a conspiracy to* defraud the government be comprised of affirmative acts only.

Accordingly, whereas a party such as the *Piacentile* defendant who has taken literally no affirmative action on which FCA liability may be grounded will not be subject to a claim under that statute, FCA liability will lie against a defendant who incurs-and fails to fulfill-an obligation to protect the government from pecuniary loss. Such unquestionably is a duty that inheres in a fiduciary relationship, and accordingly a failure by Fidelity to meet this obligation, even if accomplished through one or more omissions, could render it liable under § 3729(a)(3).

72. The section at issue in what remains of relator's first count, viz., § 3729(a)(3), similarly conditions liability on a showing that a party "conspire[d] to defraud the Government by getting a false or fraudulent claim allowed or paid."

73. Fidelity's representation that it would serve as trustee (and thus as the Navy's fiduciary) certainly would constitute such a half-truth if it intended at the time of that representation that it would undermine the Navy's security interests.

74. The court is cognizant that the existence of a materiality requirement under the FCA is a matter that has been the subject of a great deal of debate among numerous federal courts. *See Cantekin*, 192 F.3d at 415 (expressly reserving this issue). In the present context, whether such a requirement exists is beside the point; rather, the relevant fact is simply that an omission may form the basis for FCA liability where the party engaging in such nonfeasance possessed an affirmative obligation to act.

4. The Renewed Argument of Fidelity and Penn Ship that Relator Has Failed to Allege Fraud With Particularity as Required by Fed.R.Civ.P. 9(b)

a. The Applicable Pleading Standards Under Fed.R.Civ.P. 8(a) and 9(b)

The Federal Rules of Civil Procedure create a system of pleading whereby the particularity with which a litigant must state his claims varies with the substance of his assertions. As a general matter, pleadings setting forth one or more claims must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). However, when a litigant alleges fraud, he must do so "with particularity." Fed. R.Civ.P. 9(b). In order to satisfy this exacting standard, the plaintiff must "plead (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir.1992) (citing *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 99 (3d Cir. 1983)). The stringency of this requirement stems from the Federal Rules' goal of

> protect[ing] a defending party's reputation from harm, to minimize strike suits, and to provide detailed notice of a fraud claim to a defending party. The Rule [9(b) ] also discourages meritless fraud accusations that can do serious damage to the goodwill of a business or a professional person. The requirements of Rule 9(b) effectively prevent a claimant from searching for a valid claim after a civil action has been commenced.

2 James Wm. Moore et al., Moore's Federal Practice, § 9.03[1][a] (3d ed.2002) (citations omitted).

As has been recognized by our Court of Appeals, however, most purveyors of fraud-and especially those who engage in fraudulent activities within the corporate sphere-are consciously and vigilantly engaged in an effort to disguise the nature of their endeavors. *See Craftmatic Secs. Litig. v. Kraftsow,* 890 F.2d 628, 645 (3d Cir.1989) (explicitly noting that "sophisticated defrauders" can be expected to attempt to "conceal the details of their fraud"). Accordingly, in order to legally account for this facet of real world experience, Rule 9(b)'s particularity requirement is properly relaxed "when factual information [regarding the defendant's conduct] is peculiarly within the defendant's knowledge or control." *Id.* "Nonetheless," as the Third Circuit has stated, "even under a nonrestrictive application of the rule, pleaders must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based." *Id.*

In *Atkinson,* the court applied these legal principles in the context of relator's first count. After surveying the pertinent jurisprudence of our Court of Appeals and several cases decided by district courts within this circuit, I concluded that relator was "required to allege the underlying fraud with particularity, but [that] the allegations of the conspiracy need[ed] only satisfy the notice pleading standards of Rule 8." 2000 WL 1207162, at *10. This determination incorporated a recognition that an alleged conspiracy to defraud actually can be divided into the skeletal agreement between two or more persons, i.e., the conspiracy stripped of its substantive corpus, on the one hand, and the fraudulent composition of that agreement on the other. *See generally Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989) (holding that "'allegations of conspiracy are not measured under the ... [Fed.R.Civ.P.] 9(b)

standard, which requires greater particularity of allegation of fraud, but are measured under the more liberal ... [Fed. R.Civ.P. 8(a)] pleading standard' " (quoting *Odesser v. Continental Bank,* 676 F.Supp. 1305, 1313 (E.D.Pa.1987))).

b. Discussion

As applied to the version of the first count that appeared in relator's second amended complaint, these principles yielded the conclusion that that count was nonjusticiable. *See Atkinson,* 2000 WL 1207162, at *11–12. Indeed, although plaintiff's second amended conspiracy count featured allegations that Penn Ship, Fidelity, and Sun Ship-which, as stated, is no longer a party to this action-had agreed to defraud the Navy, none of these contentions satisfied even the notice pleading standard set forth in Fed.R.Civ.P. 8(a). As is presently relevant, relator's allegation of a conspiracy between Penn Ship and Fidelity failed because "[a]lthough ... plaintiff claim[ed] that Fidelity never recorded the Navy's security interests, he [did] not claim, in any more than a conclusory fashion, that this was the result of any agreement to defraud." *Id.* at *12. Although the court recognized that relator had "sufficiently plead the commission of overt acts by Fidelity," I also held that "[t]hese allegations ... [did] not alleviate the plaintiff's task of also pleading a vital part of the conspiracy, that is, the existence of an agreement to defraud." *Id.*

Penn Ship and Fidelity assert that these deficiencies in Atkinson's pleading have not been rectified in his third amended complaint, and in support of this contention they raise two primary arguments. First, they allege that the allegations in the present incarnation of relator's complaint remain impermissibly conclusory. *See* Memorandum in Support of Motion of Defendant Pennsylvania Shipbuilding Company to Dismiss the First, Second, Sixth, Tenth, Eleventh and "Additional" Claims of the Third Amended Complaint ("Penn Ship's 12(b)(6) Memo.") at 6 ("As with its predecessor, the [c]omplaint's only allegation concerning the requisite agreement (¶ 70) asserts in conclusory fashion that 'both Penn Ship and Fidelity knew and intended, and agreed, that when the trust indenture was first offered to the Navy ... the Security Instruments would not be recorded and the security interests they created would not be perfected.' ") (emphasis omitted); Defendant First Fidelity Bank, N.A.'s Memorandum of Law in Support of Motion to Dismiss Third Amended Complaint ("Fidelity's 12(b)(6) Memo.") at 17 (advancing a similar argument based on the conclusory nature of the third amended complaint's conspiracy allegation). Second, defendants contend that the allegations offered by plaintiff in support of his conspiracy claim are overly speculative, i.e., are based solely on Atkinson's beliefs-as opposed to verifiable facts-as to the existence of a concerted effort between Penn Ship and Fidelity to defraud the Navy. *See* Penn Ship's 12(b)(6) Memo. at 6–7; Fidelity's 12(b)(6) Memo. at 19 ("[I]t is noteworthy that the entire complaint is based upon information and belief, and that some of the most critical conclusions asserted against Fidelity are asserted as Atkinson['s] beliefs. Rather than provide substantiation for the most damning allegations, Plaintiff's Third Amended Complaint sends the clear signal that there is a distancing from them by certain persons involved in its preparation.").

Relator responds by arguing as follows:

> [T]he first count ... alleges a specific agreement to make false and reverse false claims to the Navy, not to record the trust indenture security interests and to conceal the fact of non-recordation from the Navy. Each false claim or reverse false claim specified in subsequent claims is further alleged to have been made by Penn Ship in furtherance

of the conspiracy, and to have been reasonably foreseeable to Fidelity, as a conspirator.

Relator's Memo. at 12.

Defendants' first assertion, viz., that plaintiff's conspiracy allegation is impermissibly conclusory, is unpersuasive. As stated in *Atkinson,* to state a viable claim under § 3729(a)(3), a plaintiff must demonstrate: " '(1) that the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States and (2) that one or more conspirators performed any act to get a false or fraudulent claim allowed or paid.' " 2000 WL 1207162, at *7 (quoting *Hill,* 676 F.Supp. at 1173). In this case, the first count of relator's third amended complaint incorporates by reference the allegations contained in the paragraphs that precede it, and, coupled with the assertions made in the first count itself, those contentions advance a claim pursuant to 31 U.S.C. § 3729(a)(3) that is quite specific in nature. Indeed, whereas in his second amended complaint plaintiff alleged in a wholly conclusory manner that Fidelity and Penn Ship had agreed to defraud the government, *see Atkinson,* 2000 WL 1207162, at *12, the first count in his third amended complaint is exponentially more voluminous and precise. As the court indicated in its previous opinion, it was unclear whether relator was "alleging [in his second amended complaint] that Fidelity conspired with Penn Ship, Sun Ship, or some other unknown entity." *Id.* However, such problems no longer mark relator's affirmative pleading.

In fact, it would be difficult to allege with a great deal more particularity the contours of a conspiracy. As has been stated several times throughout this memorandum, Atkinson alleges that Penn Ship and Fidelity agreed to defeat the Navy's security interests under the Trust Indenture. He avers that Fidelity's role in this scheme was threefold; it allegedly convinced the Navy not to insist on the inclusion of the delivery provision, it did not sign the UCC–1 financing statements, and it failed to ensure that the security instruments were recorded (though the public disclosure bar precludes the court from considering the former two of these three actions). Penn Ship's participation allegedly consisted simply of not recording the security instruments, as it had promised to do. By relator's account, those actions were undertaken in furtherance of an agreement between defendants to defraud the government out of monies and property to which it was entitled pursuant to the terms of the Oiler contract. These allegations concerning the conspiracy itself satisfy the standard set forth in Fed.R.Civ.P. 8(a). Indeed, there can be little reasoned debate that the current version of Atkinson's first count "describe[s] 'the general composition of the conspiracy, ... its broad objectives, and defendant[s'] general role[s] in th[e] conspiracy.' " *Rose,* 871 F.2d at 336 (citations omitted).

As for the requirements imposed by Fed.R.Civ.P. 9(b), it bears repeating that even "when factual information [regarding the defendant's conduct] is peculiarly within the defendant's knowledge or control, ... pleaders must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based." *Craftmatic Secs. Litig.,* 890 F.2d at 645. Otherwise, a claim of fraud must be stated with the high degree of particularity that is required by Rule 9(b). In either case, the claimant's pleading must be sufficiently rooted in fact so as to " 'safeguard defendants against spurious charges of immoral and fraudulent behavior.' " *United States ex rel. Waris v. Staff Builders, Inc.,* 1999 WL 179745, at *5 (E.D.Pa. Mar. 4, 1999)

(quoting *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984)); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir.1997) (discussing "the goals of Rule 9(b), which include the deterrence of frivolous litigation based on accusations that could hurt the reputations of those being attacked").

In this case, plaintiff's allegations regarding the fraudulent substance of the agreement between defendants are stated with sufficient specificity so as to satisfy the more stringent, undiluted specificity requirements imposed by Fed.R.Civ.P. 9(b). To reiterate, in order to satisfy this standard, plaintiff must allege: (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage.[75] *Shapiro*, 964 F.2d at 284. Atkinson alleges that Fidelity represented to the Navy that it would serve as a fiduciary thereof-and thus, as a matter of law, that it would take reasonable measures to protect the res of the Trust Indenture-when it actually intended to defraud the Navy by failing to ensure the recordation of its security instruments. This allegation concerns a specific, knowingly false statement of a most material fact, the falsity of which the Navy was unaware, that the Navy was intended to, and did, act upon to its detriment. Similarly, plaintiff avers that Penn Ship stated that it would record the security instruments when it had no intention of doing so. This assertion too concerns a precise, knowingly false statement that allegedly was successfully made by Penn Ship as a means of inducing the Navy, which was ignorant of the statement's falsity, to agree to the terms of the Trust Indenture, and thus to the Oiler contract. Indeed, as stated above, it would be difficult to delineate with more particularity the contours of the fraudulent substance of a conspiracy. *Compare, e.g., Christidis*, 717 F.2d at 100 (labeling insufficient under Rule 9(b) the plaintiff's allegation that the defendant bankers knew or should have known that the relevant loan loss reserves were understated where the plaintiffs had not disclosed "the manner in which, in establishing reserves for bad debts, in the financial statements relied upon, defendants knowingly departed from reasonable accounting practices").

The more difficult question, however, is whether these assertions are sufficiently grounded in fact so as to protect defendants against specious allegations of wrongdoing. Notably, it is to this issue that defendants' second argument in favor of dismissal pursuant to Fed.R.Civ.P. 12(b)(6), i.e., that relator's conspiracy claim is unacceptably speculative, applies with the most force. Indeed, regardless of how detailed a given allegation of fraud might be, it will not fall within the ambit of Fed.R.Civ.P. 9(b) if it is rooted in conjecture, speculation or supposition. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418 ("[E]ven under a relaxed application of Rule 9(b), boilerplate and conclusory allegations will not suffice.... Plaintiffs must accompany their legal theo-

75. It is important not to confuse these factors with those that comprise a conspiracy allegation under 31 U.S.C. § 3729(a)(3). Whereas a viable conspiracy claim under that section is comprised of a showing of an agreement to defraud the government coupled with the performance of " 'any act to get a false or fraudulent claim allowed or paid,' " *Atkinson*, 2000 WL 1207162, at *7 (quoting *Hill*, 676 F.Supp. at 1173), the above showings must be made in order to demonstrate the fraudulent substance of an agreement. As stated, relator's assertions as to the existence of the agreement itself are not subject to the heightened pleading standard articulated in Rule 9(b). *See id.* at *10.

ry with factual allegations that make their theoretically viable claim plausible."). Yet in assessing the satisfaction of this aspect of Rule 9(b), it is important to reiterate that this analysis is required only with respect to those aspects of plaintiff's complaint that must be pled with particularity. Thus, I need not assess the extent to which Atkinson's allegations regarding the conspiracy itself (as opposed to its fraudulent composition)-or put differently, the very existence of an agreement between Penn Ship and Fidelity-are empirically rooted. *See Atkinson,* 2000 WL 1207162, at *10. It is only relator's assertions as to the fraudulent substance of that agreement that must be demonstrably grounded in fact.

To be sure, some of the elements of Atkinson's first count-as originally set forth in his third amended complaint-rest on a foundation of pure speculation. For example, plaintiff asserts not that Fidelity convinced the Navy not to insist on the delivery provision, but rather that he believes-as a product of one inference built upon another-that it did so. *See* Complaint ¶ 70H.[76] This assertion, however, is not a justiciable element of count one due to the operation of the public disclosure bar. By contrast, the fraudulent character of the two elements of plaintiff's first count that withstand public disclosure analysis is empirically evidenced in a significantly more substantial way. Specifically, it is indisputable that Penn Ship agreed to record the Navy's security instruments; this promise is explicitly memorialized in the Trust Indenture, to which Penn Ship was a signatory. *See* Trust Indenture ¶ 14. Moreover, Penn Ship's failure to fulfill this obligation was conclusively confirmed by Schorsch's inspection of the Delaware county records, which revealed the non-recordation. It is equally clear that Fidelity agreed to serve as the Navy's trustee under the Indenture, and thus, as a matter of fiduciary duty, to protect the trust res; this promise is too contained in the plain language of that agreement, to which Fidelity also was a signatory. *See* Trust Indenture at 1 (designating Fidelity as "trustee"). It similarly is unquestionable that Fidelity failed to ensure such recordation; given that the instruments were not recorded, then, *ipso facto,* Fidelity failed to ensure their recordation.[77] Thus, not only does relator possess a substantial factual basis for his allegations that the parties failed to fulfill their respective obligations with respect to the instruments, but in fact he can prove such to be the case. More-

**76.** This paragraph reads in full as follows:

> Based upon the fact that the purely ministerial obligation of delivery that this request would have imposed would have been Fidelity's, and not Penn Ship's, and that it would have aroused Navy suspicion and jeopardized the contract award for Penn Ship to object to such an easily complied-with provision that placed no additional burden or obligation on it and to which it might have no legitimate reason to object, Atkinson believes and alleges that it was Fidelity, acting with the knowledge of Penn Ship and in furtherance of its purposes, that obtained the Navy's acquiescence in not including this provision. Atkinson believes Fidelity did this by assuring the Navy that the provision was unnecessary, in that the Navy could rely upon Fidelity, in discharge of its duties as trustee, to ascertain the status of the security interests' perfection and take whatever steps were reasonably necessary to achieve and maintain such perfection.

Complaint ¶ 70H.

**77.** For the sake of clarity, which in this case trumps the risk of redundancy, it is worth repeating that these actions, standing alone, would not give rise to a claim under § 3729(a)(3) unless they were fraudulent in character. Relator asserts that they are indeed fraudulent because Penn Ship promised the Navy that it would record the security interests, while Fidelity implicitly guaranteed that it would protect the trust res.

over, none of the parties to the instant proceedings contend that the Navy did not rely-indeed, insist-on the Trust Indenture as a precondition to its agreement to the terms of the Oiler contract, nor do any of them argue that the Navy's reliance thereon ultimately worked to its financial detriment.

Thus, the only remaining showings that must be made by Atkinson in order to establish the fraudulent nature of these actions are that 1) at the time that defendants lent the Navy their respective assurances, they knew their representations to be fraudulent; and 2) Penn Ship and Fidelity intended that the Navy should rely and act on the basis of those promises. These, of course, are matters that concern defendants' intentions and knowledge, which may be plead "generally" pursuant to Fed.R.Civ.P. 9(b). Notably, in *In re Burlington Coat Factory Sec. Litig.*, the Third Circuit held that a litigant in a securities fraud action who alleges that a defendant acted with the requisite scienter must do so by "alleging specific facts that give rise to a 'strong inference' that the defendant possessed [that condition of mind]." 114 F.3d at 1418 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir.1995)). However, in *Atkinson* I expressly declined to extend this rationale to pleadings asserting FCA violations. *See* 2000 WL 1207162, at *9 n. 13; *id.* at *9 n. 14 ("[T]he specific intent that is required to be pleaded with particularity is ... whatever intent makes the statement false, not any specific intent to defraud.").

To the extent that plaintiff is required to come forward with empirical substantiation of his assertion that defendants did not intend to fulfill their respective promises to the Navy when these assurances were lent, he has done so by pointing to the very facts of Penn Ship's non-recording and Fidelity's failure to ensure such recordation. In *Atkinson,* I recognized that the "mere nonperformance of a promise does not give rise to an inference of an intent not to perform at the time the promise was made absent the existence of other factors such as the passage of only a short period of time between the promise to perform and the failure to perform." 2000 WL 1207162, at *19 (citing *United States v. Shah,* 44 F.3d 285, 293 n. 14 (5th Cir.1995)). However, although certainly accurate, this maxim does not prevent plaintiff from inferring from defendants' nonfeasance vis-a-vis the security instruments that Penn Ship and Fidelity intended not to fulfill their respective promises to the Navy at the time that they incurred these obligations. The plain language of the Trust Indenture required Penn Ship to record the Navy's security instruments "*promptly* following [the] Indenture becoming effective and binding...." Trust Indenture ¶ 14 (emphasis added). Penn Ship and Fidelity signed the Indenture on March 15, 1985, and it became effective on May 6, 1985.[78] Accordingly, only six weeks elapsed between defendants' promises to perform under the Indenture and the breach of those promises. This is a far cry from the nineteen months that passed between the acceptance of the Trust Indenture and Penn Ship's mortgage of the Sun 800 to Fidelity in December, 1986, which I held in *Atkinson* not to qualify as a "short period of time." 2000 WL 1207162, at *19. Furthermore, there is no indication that the circumstances under which defendants were to perform under the Indenture materially changed during those six weeks, and this strongly supports the conclusion that relator may indulge in this inference. *See Shah,* 44 F.3d at 293 n.

78. As is more fully discussed *supra,* on March 26, 1985, the Navy assented to the terms of the Trust Indenture, and on May 6, 1985, it awarded the Oiler contract to Penn Ship, thereby rendering the Indenture immediately effective.

14 ("'[W]here only a short time elapses between the making of the promise and the refusal to perform it, and there is no change in the circumstances,' an intent not to perform when the promise was made may, in appropriate circumstances, be properly inferred." (quoting 37 Am.Jur.2d, Fraud and Deceit, § 478)). Thus, while relator was not permitted to infer from the mortgage of the Sun 800 to Fidelity that defendants intended not to perfect the Navy's security interests under the Indenture, he may base such an inference on the very non-perfection of those interests.

As such, relator's general allegations that defendants' representations were knowingly false and that they intended the Navy to detrimentally rely on these statements satisfy the applicable pleading standard under Fed.R.Civ.P. 9(b). They are not impermissibly speculative, as defendants assert.

In sum, then, Atkinson's allegations regarding the existence of a conspiracy between Penn Ship and Fidelity are sufficiently explicit so as to satisfy Rule 8(a). His assertions regarding the fraudulent substance of that agreement are pled with enough particularity, and are secured by sufficiently firm empirical moorings, so as to satisfy Rule 9(b). Accordingly, defendants' arguments for dismissal are unavailing insofar as they sound in plaintiff's failure to allege fraud with the particularity mandated by either of these rules.

5. The Argument of Fidelity and Penn Ship that Reverse False Claims Are Not, and Never Have Been, Actionable Under § 3729(a)(3)

Defendants argue that insofar as Atkinson alleges in his conspiracy claim that Penn Ship and Fidelity agreed "to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government," § 3729(a)(7), that claim must be dismissed, as such reverse false claims are not actionable under § 3729(a)(3). *See* Fidelity's 12(b)(6) Memo. at 21–23; Penn Ship's 12(b)(6) Memo. at 6–9. This argument is drawn from the plain language of the FCA's conspiracy provision, which renders liable only persons who "conspire[ ] to defraud the Government by getting a false or fraudulent claim allowed or paid." § 3729(a)(3). Defendants also contend that even if reverse false claims are presently actionable under § 3729(a)(3), the FCA's reverse false claims provision, § 3729(a)(7), took effect as a product of the Act's 1986 amendments, and thus does not provide a basis for a conspiracy claim insofar as the alleged reverse false claims were made prior to October 27, 1986.

Relator does not dispute defendants' assertion regarding the actionability of conspiracy allegations based on pre–1986 reverse false claims. *See id.* at 28 (recognizing that reverse false claims became actionable only after the alleged commencement of the Penn Ship–Fidelity conspiracy). However, he responds to the remainder of defendants' argument by asserting that their contention lacks authoritative support, and that at least two cases hold that reverse false claims are actionable under § 3729(a)(3). *See* Relator's Memo. at 26 (citing *United States ex rel. S. Prawer & Co. v. Verrill & Dana*, 962 F.Supp. 206, 207 (D.Me. 1997) and *United States ex rel. Sequoia Orange Co. v. Oxnard Lemon Co.*, 1992 WL 795477, at *8 (E.D.Cal. May 4, 1992)). He further points to what he deems "Congress's belief [in 1986] that reverse false claims were already ... encompassed under the conspiracy section of the [FCA]." Relator's Memo. at 28.

After considering the various arguments raised by the parties, I conclude that defendants have the better of this particular dispute. Simply stated, it is axiomatic that "[w]hen confronted with a

statute which is plain and unambiguous on its face, we ordinarily do not look to legislative history as a guide to its meaning." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (citing *Ex Parte Collett*, 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207 (1949)); *see also Wilson v. United States Parole Comm'n*, 193 F.3d 195, 198 (3d Cir.1999) ("A statute, clear and unambiguous on its face, will not be interpreted by a court; only statutes which are of doubtful meaning are subject to the process of statutory interpretation." (citing *Hamilton v. Rathbone*, 175 U.S. 414, 419, 20 S.Ct. 155, 44 L.Ed. 219 (1899))). Section 3729(a)(3) is precisely such an enactment-its terms are susceptible to only one meaning, namely that a person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid" will be liable for so doing. 31 U.S.C. § 3729(a)(3). Plainly excluded from those terms is liability for a person who conspires to defraud the United States by concealing his or her own financial obligation to the government. This is so despite Congress's unquestionable awareness of the substantive distinction between reverse false claims for payment and reverse false claims. *Compare* § 3729(a)(2) (concerning false claims) *with* § 3729(a)(7) (concerning reverse false claims).

It is true, as defendant notes, that the *Prawer & Co.* court implied that reverse false claims are actionable under § 3729(a)(3). *See* 962 F.Supp. at 208 n. 2. However, that court undertook virtually no analysis of this issue, and this aspect of its holding consequently should not be afforded undue weight. The *Sequoia Orange* court, by contrast, did not even imply that reverse false claims are actionable under § 3729(a)(3); it merely discussed the legislative history of the enactment of § 3729(a)(7). *See* 1992 WL 795477, at *8–9. Moreover, although the legislative history cited by defendant (and discussed in *Sequoia Orange*) might tend to support plaintiff's reading of the conspiracy provision, *see id.*, such is irrelevant when it is considered in light of the plain, contrary language that ultimately was chosen by Congress. While it is possible that the words selected are the product of a congressional oversight-though this is a matter into which the court has no especial insight-that would be a matter properly rectified by Congress, and until it does so, the court is bound to abide by the plain meaning of § 3729(a)(3).

6. The Argument of Penn Ship that Atkinson's First Count is Barred by the Statute of Limitations Insofar as it is Based on False or Fraudulent Claims Submitted Prior to December 4, 1988

Penn Ship argues-and, as indicated in *Atkinson*, relator agrees-that claims of a private relator sounding in the violation of any subsection of § 3729 are governed by the six year statute of limitations codified at 31 U.S.C. § 3731(b)(1). *See Atkinson*, 2000 WL 1207162, at *11 n. 17; Memorandum in Support of Defendant Pennsylvania Shipbuilding Company's Motion for Partial Dismissal on Statute of Limitations Grounds ("Penn Ship's Limitations Memo.") at 3. Accordingly, it posits, "relator is limited to seeking only those damages and penalties resulting from any claims submitted less than six years prior to the filing of this action on December 4, 1994." Penn Ship's Limitations Memo. at 5. This assertion must be considered in light of the court's conclusion that claims submitted by Penn Ship before October 27, 1986 are governed by the pre-amendment version of the FCA's public disclosure bar, and thus are not actionable. *See supra.* This argument, then, has a potentially dispositive impact only with respect to claims submitted between October 27, 1986 and December 4, 1988.

Atkinson responds to Penn Ship's contention by noting that this court already

has held that "further development of the record is necessary before the court can determine whether the statute of limitations ... for this conspiracy claim bars th[is] action." Relator's Memo. at 50 (quoting *Atkinson,* 2000 WL 1207162, at *11 n. 17). Moreover, he appears to aver, the conspiracy at issue in his first count continued through the ultimate release of the Navy's contractual and statutory rights under the Oiler Contract, and thus that the limitations period began to run only upon the termination of the contract. *See id.* at 50–51.

Upon considering the competing arguments as to this issue, I conclude that Penn Ship again has staked out the sounder legal position. As the court recognized in its previous memorandum in this matter, " '[i]n the Third Circuit, the statute of limitations period for a civil conspiracy runs from each overt act causing damage.' " *Atkinson,* 2000 WL 1207162, at *11 n. 17 (quoting *Wells v. Rockefeller,* 728 F.2d 209, 217 (3d Cir.1984)). Consequently, in assessing the applicability of the limitations period to a civil conspiracy claim, " 'courts distinguish between continuing unlawful acts, and continued ill effects from an original violation.' " *Id.* (quoting *Drum v. Nasuti,* 648 F.Supp. 888, 903 (E.D.Pa.1986)). In the context of relator's conspiracy claim, each submission by Penn Ship of a voucher or invoice for payment constituted a separate act in furtherance of the alleged conspiracy between Fidelity and Penn Ship, and each consequently caused the FCA's limitations period to begin running anew. *See generally Jana, Inc. v. United States,* 41 Fed. Cl. 735, 742 (Fed.Cl.1998) (collecting cases and concluding that "[t]he majority of district courts (and a court of appeals) considering the issue have concluded that, if the government makes payment on a submitted false claim, the FCA statute of limitations starts running on the date payment was made, rather than on the (earlier) date the claim was submitted"). Indeed, Penn Ship implicitly recognizes this, as it does not contend that relator's instant claims are barred insofar as they are based on false claims submitted within six years of the date on which plaintiff filed his first complaint in this matter. Under the unambiguous language of § 3731(b)(1), then, Atkinson's conspiracy count is justiciable only insofar as it seeks recovery for claims submitted or payments received by Penn Ship within six years of the date of the initial filing of this action, viz., on or after December 4, 1988. *See United States ex rel. Fisher v. Network Software Assocs., Inc.,* 180 F.Supp.2d 192, 194–95 (D.D.C.2002) (holding that because the "central event in th[e] case" had transpired more than six years prior to the filing of the FCA suit, the relator's claim under § 3729(a)(3) was justiciable only insofar as "other acts allegedly constituting violations of the FCA in furtherance of the conspiracy ... occurred within the six-year limitations period").

To be sure, the standard for granting a motion pursuant to Fed.R.Civ.P. 12(b)(6) on statute of limitations grounds is exacting. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1385 n. 1 (3d Cir.1994) ("While the language of Fed. R.Civ.P. 8(c) indicates that a statute of limitations defense cannot be used in the context of Rule 12(b)(6) motion to dismiss, an exception is made where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading."). In this case, however, the FCA's six year limitations period plainly bars relator's first count insofar as it is based on claims submitted prior to December 4, 1988.[79] Accordingly, Penn Ship's motion

**79.** As stated, *supra,* the Oiler contract was converted to a fixed price agreement through

for partial dismissal pursuant to Fed. R.Civ.P. 12(b)(6) will be granted with respect to Atkinson's conspiracy count insofar as it is based on such claims.

### III. Conclusion

For the foregoing reasons, each count of Atkinson's third amended complaint-with the exception of the first-is rendered nonjusticiable by the FCA's public disclosure bar. These counts consequently will be dismissed pursuant to Fed.R.Civ.P. 12(b)(1). However, relator's first count is justiciable, albeit in a somewhat truncated form. Specifically, it is within the court's subject matter jurisdiction insofar as 1) it is based on Penn Ship's failure to record the Navy's security instruments and Fidelity's failure to ensure such recordation; and 2) it is based on actual claims for payment (as opposed to reverse false claims) that were submitted after December 4, 1988. Thus although Penn Ship's motion for partial dismissal on statute of limitations grounds will be granted, as will its motion to dismiss relator's first count insofar as it is based on reverse false claims made by Penn Ship, defendants' motions pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) will be denied to the extent that they seek to dismiss relator's first count in its entirety.

An appropriate order follows.

### Order

And now, this ____ day of August, 2002, upon consideration of relator's third amended complaint (Doc. # 118), defendant First Fidelity Bank, N.A.'s supplemental memorandum of law in support of motion to dismiss for lack of subject matter jurisdiction (Doc. # 129), the motion of defendant Pennsylvania Shipbuilding Company for partial dismissal on statute of limitations grounds (Doc. # 130), the motion of defendant Pennsylvania Shipbuilding Company to dismiss the first, second, sixth, tenth, eleventh and "additional" claims of the third amended complaint (Doc. # 131), the motion of defendant Pennsylvania Shipbuilding Company to Dismiss the third amended complaint for lack of subject-matter jurisdiction and the appendix in support thereof (Doc. # 132), the reply memorandum of defendant First Fidelity Bank in support of its motion to dismiss the third amended Complaint (Doc. # 136), the joinder by defendant First Fidelity Bank in Penn Ship's reply memorandum of law in support of its motion to dismiss for lack of subject matter jurisdiction (Doc. # 137), the reply memorandum by defendant Pennsylvania Shipbuilding Company on its motion for partial dismissal on statute of limitations grounds (Doc. # 138), the reply by defendant Pennsylvania Shipbuilding Company to relator's opposition to its motion to dismiss the first, second, sixth, tenth, eleventh and "additional" claims for failure to state claims upon which relief can be granted (Doc. # 139), the reply by defendant Pennsylvania Shipbuilding Company to relator's opposition to motions to dismiss for lack of subject-matter jurisdiction (Doc. # 140), plaintiff-relator's memorandum of law in opposition to defendants' motions to dismiss for failure to state a claim, lack of jurisdiction and statute of limitations (Doc. # 144) and the appendix of exhibits submitted in support thereof (Doc. # 143), plaintiff-relator's sur-reply memorandum of law in opposition to defendants' motions to dismiss for lack of jurisdiction (Doc. # 145) and the response of Pennsylvania Shipbuilding Company to relator's sur-reply memorandum in opposition to the motions to dismiss for lack of subject-matter

the execution of Mod. 5 on June 16, 1988. Thus, the "claims" on which plaintiff's conspiracy count may validly be based include only payments made by the government pursuant to this fixed price arrangement after December 4, 1988.

jurisdiction (Doc. # 147), it is hereby OR-DERED that:

A) Defendants' motion to dismiss the third amended complaint pursuant to Fed. R.Civ.P. 12(b)(1) is GRANTED IN PART and plaintiff's complaint is dismissed with prejudice except with respect to relator's first count insofar as it sounds in Penn Ship's failure to record the Navy's security instruments and Fidelity's failure to ensure such recordation;

B) Penn Ship's motion to dismiss relator's first count pursuant to Fed.R.Civ.P. 12(b)(6) is GRANTED IN PART and the first count of plaintiff's complaint is dismissed with prejudice to the extent that it sounds in reverse false claims on the part of Penn Ship;

C) Penn Ship's motion for partial dismissal on statute of limitations grounds is GRANTED and the first count of plaintiff's complaint is dismissed with prejudice to the extent that it is based on claims submitted prior to December 4, 1988;

D) The balance of defendants' motions are denied.